## 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

### E. B. BRYAN V. COMMONWEALTH.

November 17, 1921.

1. HOMICIDE—*Presumption that Homicide is Murder in the Second Degree—Burden of Proof.*—Every homicide is *prima facie* murder in the second degree, and the burden is upon the defendant to establish to the satisfaction of the jury any justification or excuse relied upon by him.

2. HOMICIDE—*Presumption of Malice—Deliberation and Premeditation Questions for Jury.*.—The law presumes malice from the fact of the killing, but it does not presume that the act was willful, deliberate, and premeditated. The sufficiency of the evidence on the one hand to establish the willful, deliberate and premeditated character of the act, or, on the other, to rebut the presumption of malice, is generally a question which lies peculiarly within the province of the jury.

3. HOMICIDE—*Malice—Provocation—Cooling Time—Case at Bar.*— In the instant case, accused, upon the confession of his wife of illicit relations with deceased, immediately got his pistol, walked to deceased's office about one hundred and twenty-five yards, stopping at a drug store for an instant to inquire about deceased, and at once opened fire upon deceased.

   *Held:* That even if the evidence had disclosed no circumstance to discredit accused's claim that he acted solely under the propulsion of hot blood and frenzy, engendered by his wife's confession, it is not at all certain that the trial court would not have improperly invaded the province of the jury if it had set aside the verdict of guilty of murder in the second degree on the ground that the evidence was insufficient to show that the killing was malicious.

4. HOMICIDE—*Murder in the Second Degree—Evidence Sufficient to Support Verdict—Case ot Bar.*—In the instant case, where accused immediately upon receiving his wife's confession of illicit relations with deceased, walked a short distance to deceased's office and killed him, there were certain circumstances in the case, as shown by the evidence, entirely proper for the consideration of the jury upon the question of whether accused acted solely under the influence of the confession. Certain letters

of deceased to accused's wife, which accused claimed to have found, were not produced. Accused's narrative on the stand could hardly be characterized as connected and convincing, and there was evidence of the Commonwealth tending to show that accused's wife was, and had long been, a woman of unchaste character, and that accused knew that fact. The explanation of accused of why he took with him, when seeking deceased, an iron which he had purchased from deceased, was not satisfactory.

Held: That a judgment of murder in the second degree would not be disturbed as against the evidence.

5. HOMICIDE—*Evidence—Previous Character of Accused's Wife.*—In a prosecution for homicide, where accused claimed to have acted in hot blood, engendered by a confession of his wife of her illicit relations with deceased, evidence of the previous unchaste character of the wife, and that accused had knowledge of this reputation, is admissible.

6. HOMICIDE—*Evidence—Truth of Confession of Wife of Accused of Illicit Relations with Deceased.*—In a prosecution for homicide, where accused claimed to have acted in hot blood, engendered by a confession of his wife of her illicit relations with deceased, the trial court did not err in refusing to permit accused to introduce proof of the truth of his wife's confession.

7. HOMICIDE—*Evidence—Illicit Relations Between Wife of Accused and Deceased—Evidence as to Deceased's Regard for His Wife.*—In a prosecution for homicide, where accused claimed to have acted in hot blood, engendered by a confession of his wife of her illicit relations with deceased, evidence of statements of accused that he suspected his wife of improper relations with others; that he doubted her chastity, and that she was doing things that he could not put up with, were admissible to show in what esteem accused held his wife in order to determine the probable effect of the confession.

8. NEW TRIALS—*Impeachment of Verdict—Testimony of Jurors.*— There are no conceivable circumstances under which the testimony of the jurors themselves may be resorted to in order to impeach their verdict.

9. NEW TRIALS—*Impeachment of Verdict—Testimony of Jurors— Quotient Verdict.*—It appeared from the affidavit of defendant in a prosecution for homicide that the jury determined the number of years that they thought defendant should be imprisoned by a quotient verdict. In arriving at this verdict several of the jurors wrote down more than twenty years under an honest mistake as to the number of years fixed by the statute as the maxi-

mum punishment for second degree murder. The court was
asked to set aside the verdict on this ground, but refused.
Held: No error.

10.   HOMICIDE—*Instructions—Omission of the Word "Premeditated."*
—In a prosecution for homicide, where accused claimed to have
acted in hot blood, engendered by a confession of his wife of her
illicit relations with deceased, the court in an instruction, the
main purpose of which was to advise the jury as to the effect
which they should ascribe to the confession of the wife, said if
the killing was done "with malice, deliberate and willful, it is
murder in the first degree." It was insisted that the instruction
was erroneous because it omitted the word "premeditated."
   Held:   No cause for reversal where there was another instruc-
tion given for the express purpose of defining murder in the
first degree, which expressly told the jury that the killing must
have been willful, deliberate, and premeditated.

11.   HOMICIDE—*Instructions—Omission of the Word "Premeditated."*
—*Harmless Error.*—In a prosecution for homicide an instruc-
tion that if the killing was done "with malice, deliberate and
willful, it is murder in the first degree," omitting the word "pre-
meditated," is harmless, where the jury, as a matter of fact,
found the defendant guilty of murder in the second degree and
not of murder in the first degree.

Error to a judgment of the Circuit Court of Botetourt
county.

*Affirmed.*

The opinion states the case.

*Haden & Haden* and *Wm. R. Allen,* for the plaintiff in
error.

*John R. Saunders, Attorney-General, J. D. Hank, Jr.,
Assistant Attorney-General,* and *Leon M. Bazile, Second
Assistant Attorney-General,* for the Commonwealth.

KELLY, P., delivered the opinion of the court.

This case is here upon a writ of error to a judgment of
the Circuit Court of Botetourt county, sentencing the de-
fendant, E. B. Bryan, to a term of twenty years in the

penitentiary upon a conviction of murder in the second degree.

About noon of the 28th day of October, 1920, Bryan walked into the office of the Virginia Western Power Company, in the town of Buchanan, and, practically without warning, shot to death W. F. Headrick, an electrician employed by that company.

The evidence produced by the Commonwealth, standing alone, makes a case of murder in the first degree. The defense relied upon is that the act was committed in the heat of passion, engendered a few minutes prior to the killing, by a confession made to the defendant by his wife of an illicit intimacy between her and the deceased. The testimony tending to support this defense may be stated in abbreviated form, but with substantial accuracy and completeness, as follows:

The defendant and his wife had been married for twenty-five years. Their children were grown and away from home. The defendant was forty-five and his wife forty-two years of age. They lived in a second-floor apartment over a restaurant in Buchanan. The night before the killing, while the defendant's wife was on a visit to her father's home in the country, he found certain letters in her room which aroused his suspicion, and which, upon some further investigation, he concluded were probably written by the deceased. He says he was greatly troubled and worried by this discovery, and spent a sleepless and miserable night. The next morning he hired a car, went to see his wife and asked her about the letters. She said she would go back home with him, and, after arriving there, would tell him all about them. They returned together, went immediately to their room, and, according to the testimony of both of them, they sat together on the side of the bed, with their arms around each other, while she related to him all the details of an illicit relationship and intercourse, seductively brought about by the deceased, which had

existed between her and him for some weeks. The particulars of her confession may be omitted. Suffice it to say that if the jury believed that the confession, as testified to by both of them, was made, that the defendant was actuated by no other and independent grievance against the deceased, and that the natural and normal effect of such a confession by the wife to the husband was not affected by any previous similar misconduct on the part of his wife, and known to him, then the jury would have been entirely warranted in finding (as no doubt they would have found) that he gave way to rage and indignation, caused by the confession, and killed the deceased in hot blood. The confession included the statement that the deceased had first secured complete control over the sexual passions of the defendant's wife by the surreptitious use of a certain drug, administered in wine, and that thereafter she had been wholly unable to resist him. They both testified that during the confession the defendant made only one remark, and that was: "Did he do that, darling?" and that her reply was, "He did." The Commonwealth produced rebuttal evidence which will be mentioned later.

At the conclusion of this interview with his wife, the defendant immediately got his pistol, walked through the kitchen, which was on his way out, picked up in that room an electric flatiron, or smoothing iron, which he had bought from the deceased and which will be mentioned again later, and, with the pistol in his right hand, and the iron in his left, went out on the street in search of Headrick. The distance from Bryan's house to Headrick's office was about 125 yards, and he went almost immediately there, entering a drug store on the way to inquire about Headrick, saying that he was "going to kill his damn soul," and also telling Dr. C. W. Barker on the way, in answer to a question as to what he was going to do, that he was "going to kill the damned s— of a b—." On entering the Virginia Western Power Company's office, he saw Headrick sitting at a

desk inside of a compartment or pen surrounded by a railing, and thereupon he pitched the electric iron into the compartment and opened fire on Headrick, saying at the same time, "God damn you, I will kill you." He fired three shots, the first two failing to take effect, the third entering Headrick's temple and producing death a few hours thereafter.

[1, 2] The first assignment of error complains of the action of the trial court in refusing to set aside the verdict of the jury as being contrary to the evidence. We are unable to say that the court erred in this respect. Every homicide is *prima facie* murder in the second degree, and the burden was upon the defendant to establish to the satisfaction of the jury any justification or excuse relied upon by him. Minor's Syn. Crim. Law, p. 57, and cases cited. The effect of the verdict in this case was to determine, (1) that the Commonwealth did not successfully carry the burden of proof resting upon it to raise the grade of the offense to murder in the first degree by showing that the killing was "willful, deliberate and premeditated" (Code, sec. 4393), and (2) that the defendant failed to successfully carry the burden of showing that the killing was without malice on his part, and, therefore, a lesser crime than murder in the second degree. The law presumes malice from the fact of the killing, but it does not presume that the act was willful, deliberate and premeditated. The sufficiency of the evidence on the one hand to establish the willful, deliberate and premeditated character of the act, or, on the other, to rebut the presumption of malice, is generally a question which lies peculiarly within the province of the jury. In this case, the trial court, by refusing to interfere with the verdict, held, in effect, that the evidence was such as to warrant the jury in finding that the defendant had failed to successfully rebut the legal presumption against him as to the grade of his crime. In this finding we concur.

[3] The books abound in cases in which convictions of

even first-degree murder have been sustained when the kill-
ing followed the alleged provocation more quickly than in
the present case.  If the evidence disclosed no circumstance
at all to discredit the defendant's claim that he acted solely
under the propulsion of hot blood and frenzy, engendered
by his wife's confession, it is, to say the least, not at all
certain that the court would not have improperly invaded
the province of the jury if it had set aside the verdict as
being insufficient to show that the killing was malicious.
That was for the jury to decide. *Shepherd* v. *Common-
wealth,* 119 Ky. 931, 85 S. W. 191, cited with approval in
*Shipp* v. *Commonwealth,* 124 Ky. 643, 99 S. W. 945, 10 L.
R. A. (N. S.) 335, 339.

[4]  Moreover, there were, as a matter of fact, certain cir-
cumstances in the case, as shown by the evidence, entirely
proper for the consideration of the jury, and which may
have influenced them in attaching less weight to the effect
of the confession than was claimed for it by the defendant.
These circumstances will now be mentioned.

The alleged letters from Headrick to defendant's wife
were not produced at the trial.  He claimed that they had
been lost, but his testimony as to their contents and as to
their loss was vague and unsatisfactory.  As they were al-
leged by him to be the beginning and basis of his original
suspicion and subsequent anger, they would naturally be
regarded as of much importance, and it is not entirely
easy to understand the uncertainty of the testimony with
respect to them.

With reference to his own account before the jury as to
the details of his wife's confession, while that account is
corroborative of and harmonious with practically all that
his wife had previously testified to in his presence, it can
hardly be characterized as a connected and convincing nar-
rative.  Due allowance must be made for the effect which
the jury may have given to his manner and bearing on the
stand.

Some importance may have properly been attached by the jury to the fact that the defendant carried the electric iron along and pitched it into the office by the side of the deceased before opening fire upon him. There was evidence tending to show that the iron had not been paid for; that the defendant had received one or more bills for it; that there had been some misunderstanding on the part of the bookkeeping department of the Virginia Western Power Company as to the terms upon which he was to make payment therefor, and that this misunderstanding had subsequently been the subject of an interview between him and the deceased, resulting in what seems to have been a satisfactory adjustment of the matter. The transaction and its incidents were gone into very fully in the testimony on both sides, and the jury and the trial judge were in much better position than we are to estimate the bearing of these incidents on the mental attitude of the defendant toward the deceased. We are frank to say that, as the evidence appears in type, we see nothing in the account of what had passed between the defendant and the deceased to indicate bad feeling on account of the purchase of the iron; but when the defendant undertook to explain why he carried it with him when he started out to wreak vengeance on the deceased, his testimony is not satisfactory. Upon this latter point he was asked the following question and gave the following answer:

"Q. Now, why was it that on the morning after your wife had related these horrible relations between her and Mr. Headrick that you took your electric iron from your home to thte office of the Western Electric Company?"

"A. I thought maybe that might be some inducement for him to come around my house, and I just thought I would take the iron; I never paid for it, and I thought I would take it back and get rid of it."

And again:

"Q. You said you took the iron to keep Mr. Headrick from coming to your house any more?"

"A. I thought maybe it might keep him from having some excuse to come back or something. I just don't know hardly exactly how it was. I was so shocked and nervous and tore all to pieces, I don't know."

When it is recalled that he was then starting out with the expressed purpose and determination to kill Headrick, his explanation, made long after the killing, that he was taking the iron along for the purpose of removing any excuse for further visits from Headrick to his wife, is not very convincing. He was carrying a firearm with which to kill Headrick, and certainly, therefore, there was no need for a return of the iron to prevent Headrick's further visits. The jury might have accepted the theory that the picking up and returning of the iron was the irrational act of the frenzied man, or, on the other hand, that he had more than one grudge and grievance against the deceased when he started out to take the latter's life. Whether the one or the other was the correct theory was a question lying solely in the province of the jury.

Far more significant than the circumstances above adverted to, however, was the rebuttal evidence of the Commonwealth tending to show that Mrs. Bryan was, and had long been, a woman of unchaste character, and that the defendant knew that fact. A vital question for the jury to decide was as to the effect of the alleged confession on the defendant's mind, and if they believed that she had previously, with his knowledge, had improper relations with other men, this fact may very naturally and properly have been given weight by them in determining the extent to which his feelings were shocked and overwrought by the revelation of her intimacy with the deceased.

Juries are not given to dealing lightly with the violation of the sanctity of a man's home and the destruction of his wife's virtue, and they may usually be depended upon to do full justice to any husband who takes the life of another upon that score. The learned and able judge who presided

at the trial of this case, and who, like the jury, observed and heard the witnesses, saw no reason to disturb the verdict. We cannot say that this conclusion was against the evidence, and we ought not to interfere unless we find error in some of the other rulings complained of.

[5] The second assignment of error challenges the action of the trial court in allowing evidence of the previous unchaste character of the defendant's wife. What we have already said, indicates our views upon this question. Many authorities are cited to sustain this assignment, but nearly all of them relate to the rule forbidding such evidence for the purpose of impeaching the credibility of a witness. It is, of course, well settled that, as a general rule, a witness can only be impeached by evidence of general bad character for truth and veracity in the community in which the witness resides; but the evidence here complained of was neither offered nor admitted for purposes of impeachment. It was introduced and allowed solely for the purpose of enabling the jury to properly appraise the probable effect which Mrs. Bryan's confession actually had upon the mind of her husband. The trial judge, upon the first offer of any evidence of this kind, said: "I think the evidence is admissible. Of course I desire to state distinctly that I understand the Commonwealth's attorney intends to undertake to prove that the prisoner here had knowledge of this reputation which his wife sustained in the community." By Instruction "I" he told the jury that if they believed from the evidence that the defendant did not know that the general reputation of his wife for virtue was bad on the 28th of October, 1920, then they should disregard all the evidence introduced by the Commonwealth tending to show her bad character in this respect, and, further, that they must believe from the evidence beyond a reasonable doubt that the defendant did know of this general reputation of his wife before they could consider it. And, by Instruc-

tion "H," the jury were told that even if they did believe that the defendant knew of his wife's bad reputation for virtue on or before October 28, 1920, they could only consider such bad reputation and the defendant's knowledge thereof in determining to what extent he was enraged and lost his power of self-control by his wife's confession of her relations with the deceased, and that they could not consider her alleged bad reputation for any other purpose whatever.

In the case of *Garlitz* v. *State,* 71 Md. 293, 18 Atl. 39, 4 L. R. A. 601, the accused, on trial for murder of his wife, undertook to excuse his act on the ground that he was so shocked and overcome by her confession of infidelity that his mind became frenzied, and that he lost reason and control of himself and, while in this condition, committed the crime. The State was permitted to prove that the accused had had improper relations with other women, the court holding that the evidence was admissible for the purpose of showing the prisoner's esteem and appreciation of the marital relation and the improbability that he was shocked and overcome in the manner described in his testimony. See also *State* v. *Holme,* 54 Mo. 153, 165; *Fox* v. *State,* 71 Tex. Cr. R. 318, 158 S. W. 1141.

We find nothing in the case of *Shipp* v. *Commonwealth, supra,* cited and relied upon by counsel for the accused, in conflict with the views we have hereinabove expressed. In that case the trial court, strange to say, refused to permit the defendant to prove the confession of his wife as to her intimacy with the deceased, and yet, still stranger to say, allowed the Commonwealth to prove that the reputation of the wife of the accused for virtue and chastity was good. The appellate court held that the former testimony was admissible, but that the latter was not, chiefly on the ground that the truthfulness or falsity of the confession had nothing to do with the defendant's conduct, and was immaterial.

[6] Under the third assignment of error it is insisted that the court erred in refusing to permit the defendant to introduce proof of the truth of his wife's confession. We have already seen that the question of the truth of her confession was in no way a material issue in the case. The question was not whether the confession was true or false, but what effect it had upon the mind of the accused. The court correctly stated the law applicable to this phase of the case by Instruction "G," which was as follows: "The court instructs the jury that if they believe from the evidence that Mrs. Bryan told the defendant on the 28th day of October, 1920, of the alleged wrongful relations between herself and Headrick, as detailed by the defendant in his testimony, and that the defendant believed said account of said alleged wrongful relations to be true, then it makes no difference, so far as this case is concerned, whether or not Headrick and Mrs. Bryan did in fact have said wrongful relations."

Under the fourth assignment of error, which embraces a number of rulings, it is insisted that the court erred, (1) in admitting testimony of the witness Shank, who was permitted to relate a conversation had with the defendant prior to the 28th of October, 1920, in which the latter stated that he suspected his wife of improper relations with a man named Harvey; (2) in permitting the witness Vaughan to testify as to a conversation which he had with the defendant prior to October 28, 1920, in which the latter expressed doubt about the virtue and chastity of his wife, and said she was doing things which he could not stand for; (3) in permitting the witness Rogers to testify as to a conversation which he had with the defendant prior to the 28th of October, 1920, in which the latter said that he could not put up with the way his wife was doing and intended to leave her; and (4) in permitting the witnesses, Mr. and Mrs. Manly, to testify as to a conversation which they over-

heard between the defendant and his wife prior to October 28, 1920, in which he accused her of intimacy with another man.

[7] There was no error in the admission of this testimony. It was proper for the jury to know exactly in what esteem the defendant held his wife in order to determine the probable effect of the confession upon which the defendant claims to have based his action on the day of the killing.

It is insisted that the admission of such evidence tends to put a premium on immorality and to discourage a husband whose wife has been unchaste from defending his home against further violation. The argument is pressed upon us in this connection that a wronged husband has a right to cling to his erring wife and try to reform her, and that he might, under certain circumstances, feel as much outraged by a second or third invasion of his home as by the first one. This is an argument the force of which will depend in every case upon the particular circumstances, and should be addressed, as it doubtless was in this case, to the jury. It falls entirely within their province.

[8, 9] The next assignment arises out of this state of facts: The verdict of the jury was as follows: "We, the jury, find the defendant guilty of murder in the second degree, as charged in the indictment, and fix his punishment at twenty years in the penitentiary." It appears from the affidavit of the defendant, filed in the cause shortly after the verdict was rendered, that after the jury retired to their room to consider the verdict their first step was to determine the grade of the offense, two or three members in the outset being in favor of murder in the first degree, but all finally agreeing to fix the grade of the crime as murder in the second degree. After this was done, they, for the first time, began a consideration of the extent of the punishment, and this was fixed at twenty years as the result of an agreement by which each juror was to set down the number of

46

years which he thought the defendant should receive as a punishment, the sum of these figures to be divided by twelve and the quotient written into the verdict. In carrying out this agreement, several of the jurors wrote down more than twenty years as the number of years of confinement in the penitentiary which they respectively believed the defendant should receive. The affidavit further states that the jurors who used figures in excess of twenty did so under an honest mistake as to the number of years fixed by the statute as the maximum punishment for second degree murder.

The court was asked to set aside the verdict on the ground that the method of arriving at the same had been plainly prejudicial to the defendant, and had been the result of an innocent mistake on the part of some members of the jury. It was conceded that the conduct of the jurors in arriving at their verdict could not be established except by the testimony of the jurors themselves, and the court held that their evidence would not be admissible for the purpose of impeaching their verdict. The motion for a new trial on this ground was accordingly denied, and it is alleged that this was error.

We find nothing in the facts as above stated to warrant an interference with the ruling of the trial court. It is unnecessary for us to say that there are no conceivable circumstances under which the testimony of jurors themselves may be resorted to in order to impeach their verdict. This court said in *Bull's Case,* 14 Gratt. (55 Va.) 613, 632: "In view of all the authorities, and of the reason on which they are founded, we think that, as a general rule, the testimony of jurors ought not to be received to impeach their verdict, especially on the ground of their own misconduct, and without intending to decide that there are no exceptions to the rule, we think that even in cases in which the testimony might be admissible it ought to be received with very great caution. A contrary rule would hold out to unsuccessful

parties and their friends the strongest temptation to tamper with jurors after their discharge, and would otherwise be productive of the greatest evils."

As showing the extent to which the rule against the admission of testimony by jurors to impeach their verdict has been carried in Virginia, see also 4 Min. Inst. (3d ed.) 935; *Reed's Case*, 22 Gratt. (63 Va.) 924; *Thompson's Case*, 8 Gratt. (49 Va.) 637, 650; *Washington Park Co.* v. *Goodrich*, 110 Va. 692, 697, 66 S. E. 977; *Manor* v. *Hindman*, 123 Va. 767, 777, 97 S. E. 332.

The decision of the question, as it arises and as it is presented to us in this case, does not call for any extended discussion or review of the authorities. It seems to be conceded by counsel for the prisoner that under the rule as established in Virginia the testimony of jurors cannot be received to show their misconduct, the claim being that the same rule does not apply where there has been a mistake. The mistake here alleged could only have been due to the misconduct of the jury in ignoring the written instructions of the court, in which they were plainly told that murder in the second degree "is punishable by confinement in the penitentiary for not less than five nor more than twenty years."

The general rule, as approved by the United States Supreme Court and by the courts of some of our sister States, permits more latitude in the admission of evidence of this character than has generally been permitted by the rule in Virginia. Burk's Pl. & Pr. (2d ed.) 554, and cases cited; *United States* v. *Reid*, 12 How. (U. S.) 361, 366, 13 L. Ed. 1023; *Mattox* v. *United States*, 146 U. S. 140, 147, 13 Sup. Ct. 50, 36 L. Ed. 917. But even under this more liberal application of the rule, the evidence offered in the present case was properly rejected by the trial court. In *Hendrix* v. *United States*, 219 U. S. 79, 90, 31 Sup. Ct. 193, 196 (55 L. Ed. 102), the court said: "On the

motion for new trial, affidavits of four jurors were offered, stating with some detail that they did not understand the legal effect of the verdict. Only one of the affidavits is in the record. The maker states that, by finding the defendant guilty as charged in the indictment, without capital punishment, 'he did not understand what the punishment would be on such a verdict, and agreed to it on the understanding that the punishment would only be two years in the penitentiary.' He further states that he was in favor of a verdict for manslaughter, and would never have consented to the verdict had he thought or believed it 'would carry with it a life penalty.' The motion for new trial, as we have said, was denied. We see no error in the ruling."

. In the case last cited, the jury might have failed to understand the effect of their finding, because in the federal courts the punishment is fixed by the court and not by the jury, but they were not allowed to say so for the purpose of impeaching the verdict. In the instant case they necessarily understood the exact effect of their verdict. With a written instruction in their hands as to the minimum and maximum punishment, they fixed the grade of the offense as murder in the second degree, and the punishment therefor at the maximum term of imprisonment. In view of these facts, the court was clearly right in refusing to admit the testimony of the jurors as offered.

[10, 11] One other assignment of error remains to be considered. Instruction "A," the main purpose of which was to advise the jury as to the effect which they should ascribe to the confession made by the defendant's wife, in the concluding paragraph, said that if the killing was done "with malice, deliberate and willful, it is murder in the first degree." It is insisted that this instruction was erroneous because it omitted the word "premeditated" in defining murder in the first degree. It is true that the statute, section 4393 of the Code, does say that murder in the first degree is a

"willful, deliberate and premeditated killing;" but there are two answers, either of which is satisfactory, to the assignment of error here under consideration. The first is that Instruction "K," given by the court, and intended for the primary purpose of defining murder in the first degree, expressly told the jury that, to constitute murder, the killing must have been willful, deliberate and premeditated, and we think, therefore, that the omission of the word "premeditated" in the former instruction could not have misled the jury. The second and conclusive answer to the alleged error here complained of is that the jury, as a matter of fact, found the defendant guilty of murder in the second degree, not of murder in the first degree, and even if the omission of the word "premeditated" from the first instruction was error, it was plainly harmless.

For the reasons stated the judgment of the trial court must be affirmed.

*Affirmed.*