## Richmond

WILLIE BRADSHAW v. COMMONWEALTH OF VIRGINIA.

October 9, 1939.

Record No. 2174.

Present, All the Justices.

392

*Martin A. Martin,* for the plaintiff in error.

*Abram P. Staples, Attorney-General,* and *Walter E. Rogers, Special Assistant,* for the Commonwealth.

HOLT, J., delivered the opinion of the court.

On the afternoon of December 18, 1938, Willie Bradshaw shot and killed Herbert A. Boelte. At the March term, 1939, of the Circuit Court of Halifax county he was indicted for murder and at that term was tried, convicted and sentenced to death. He has appealed, and his case is now before us on a writ of error.

These are the pertinent facts and circumstances attendant upon the homicide.

The deceased, together with John Hatcher, another deputy sheriff of that county, and Roger Suddarth, driving, in an automobile went to the home of Gladys Buckner, in which Willie Bradshaw had been living for a year and one-half. This car was driven along the old Halifax courthouse road and was halted at a point about seventy-five feet from the Buckner home. The two officers then went to it, leaving Suddarth in charge of the car. These officers wished to interview Bradshaw for some purpose not disclosed by the record and had visited the Buckner home on

the preceding day for the same purpose but were unable to find him.   On the ground floor of this cabin home is a small cook room which opens into the main or living room, used also as a bedroom by Gladys Buckner, her son, Elgin, and Bradshaw.   When Hatcher knocked at the cook room door, all three of the occupants were at that time in the living room.   In response to his bid for admission, Gladys Buckner and her son went into the cook room and invited the officers to come in.   After a moment's talk, they, this woman and her son and the officers, went into the main room where they asked for Bradshaw, to which inquiry Gladys answered saying that she had not seen him since the preceding day.   In the meantime Bradshaw had gone to the floor above, which was reached by a winding stairway hidden from view by a curtain.   The character of this upper cabin story is not shown, but it was unoccupied, since all three of these people lived in the room below.   When they were told that Bradshaw was not there, Boelte pushed the curtain aside and started upstairs.   This is Hatcher's account of the situation at that time:

"Q. I wish you would go a little more in detail about the occurrence in the room when you and Boelte came from the cook room into the big room; Gladys Buckner followed you, is that correct?

"A. That is right.

"Q. And it was there that you asked her where Will Bradshaw was, and she said she hadn't seen him for some time?

"A. That was after we had gotten in the larger room.

"Q. Were you and Boelte standing together?

"A. Practically together.

"Q. Was it at that time that Boelte started up the stairs?

"A. He was walking along at that time.

"Q. And she ordered him not to go up the stairs?

"A. 'Don't go up them stairs.'

"Q. What did Boelte say?

"A. 'Let me alone.'

"Q. Did she immediately turn and get the axe?

"A. Turned into the corner and got the axe.

"Q. Did she get the axe before Boelte started upstairs?

"A. No, sir.

"Q. What did you say when she got the axe?

"A. 'Go back. Don't come up on me.'

"Q. What did she say?

"A. She was screaming and hollering.

"Q. What else did you say to her?

"A. Didn't say anything else.

"Q. Did you have a gun drawn on her?

"A. Not directly pointing to her. I had it in my hand.

"Q. Did you tell her to put the axe down?

"A. I told her to go back—not to come up on me.

"Q. And she was hollering and screaming?

"A. Yes, sir.

"Q. And it was at that time Boelte was starting upstairs, and was shot?

"Yes, sir."

We do not know if Boelte had a pistol; certainly it was not drawn when he started up the stairway. In a minute or a minute and one-half after he was shot the gun barrel was pushed through the curtain. Hatcher turned and shot at it, but his attention was distracted by the woman. Bradshaw then came through the curtain with his gun drawn down upon Hatcher, and with Hatcher thus covered made his escape. He was afterwards arrested in the adjoining county and then had with him the same shotgun, his gun; but, being covered, he was made to drop it, and his arrest followed.

It is not contended on behalf of the accused that he is guiltless, but that in the circumstances under which this homicide was committed, he might properly have been convicted either of murder in the second degree or of voluntary manslaughter. For the Commonwealth it is contended that under the evidence no other verdict than that of murder in the first degree could properly have been returned.

In criminal cases, as in all other cases, instructions should be based upon evidence, and one which in substance told the jury that they might find the accused guilty of involuntary manslaughter, in a case where murder in the first degree was established beyond all doubt by undisputed testimony, would be misleading. No jury should return such a verdict and hold, for example, that the deliberate giving of deadly poison in order to collect insurance was involuntary manslaughter. It is true that in such a case were it to so find, that verdict should be sustained, not because it is a proper verdict but because it amounts to an acquittal of murder in the first degree, and if not sustained the accused would go unpunished. *Burton & Conquest* v. *Commonwealth,* 108 Va. 892, 62 S. E. 376; *Bell* v. *Commonwealth,* 167 Va. 526, 189 S. E. 441; *Little* v. *Commonwealth,* 163 Va. 1020, 175 S. E. 767. It would permit the jury to do that which it had the power to do but not the right, although this power, if exercised, could not be overborne— not at the instance of the accused, because he would escape all punishment, and not at the instance of the Commonwealth, because it has no right of appeal. In *Tucker* v. *Commonwealth,* 159 Va. 1038, 167 S. E. 253, it was held error not to have instructed the jury on the law of manslaughter, but that was a case in which there was some evidence to show palliating circumstances. It there appears that *Burton & Conquest* v. *Commonwealth, supra,* was in the mind- of the judge who wrote the opinion, for he cites it without suggesting that it was bad law or that there was any intention to overrule it. It was the evidence which made proper an instruction on the law of voluntary manslaughter. Nor is this contrary to anything which was decided in *Fleming* v. *Commonwealth,* 170 Va. 636, 196 S. E. 696, for it was there said:

"The most casual consideration of this evidence negatives the statement that the verdict of the jury is contrary to the law and evidence and without evidence to support it."

Under Code, section 4393, murder by any wilful, deliberate and premeditated killing is murder in the first degree. All other murder is murder of the second degree.

But it is likewise true that every malicious homicide is *prima facie* murder in the second degree. *Bryan* v. *Commonwealth,* 131 Va. 709, 109 S. E. 477.

■■■ "The test of murder is malice. Every malicious killing is murder either in the first or second degree—the former if deliberate and premeditated, and the latter if not. Furthermore, there is a *prima facie* presumption of malice arising from the mere fact of a homicide, but there is no presumption therefrom of deliberation and premeditation. That is merely another way of stating the familiar rule of law that every homicide is *prima facie* murder in the second degree, and that the burden is on the accused to reduce, and on the Commonwealth to elevate, the grade of the offense. *Hill's Case,* 2 Gratt. (43 Va.) [594], 595; *Potts' Case,* 113 Va. 732, 73 S. E. 470; *Bryan's Case,* 131 Va. 709, 109 S. E. 477, 478. This, of course, does not mean that the accused may not rely upon circumstances of extenuation appearing in the evidence produced by the Commonwealth with the same effect as if brought out in evidence offered by him." *Jacobs* v. *Commonwealth,* 132 Va. 681, 111 S. E. 90.

■■■ Objection is made to Instruction No. 4 given for the Commonwealth. It reads:

"The court instructs the jury that to constitute wilful, deliberate and premeditated killing—murder in the first degree—it is not necessary that the intention should exist for any particular length of time prior to the actual killing, it being only necessary that such intention should come into existence for the first at the time of the killing, or any time previous."

This instruction has been many times approved.

■■■ "To constitute a wilful, deliberate and premeditated killing, it is not necessary that an intention to kill should exist for any particular length of time prior to the actual killing; it is only necessary that such intention should

come into existence for the first time at the time of such killing or any time previously." *Wright's Case,* 33 Gratt. (74 Va.) 880, 893, opinion by Moncure, P.

"There can not be any doubt, that at common law, if one man kills another with a previously formed design to kill, that is murder, although the design may have been formed only the moment before the fatal act is committed." *White-ford* v. *Commonwealth,* 6 Rand. (27 Va.) 721, 722, 18 Am. Dec. 771.

"No time is too short for a wicked man to frame in his mind a scheme for murder." *Smith's Trial,* page 230.

"If the defendant has time to think and did intend to kill for a minute, as well for an hour or a day, it is a wilful, deliberate and premeditated killing." Cited with approval in note appended to *King* v. *Commonwealth,* 2 Va. Cases (4 Va.) 78. *Brown's Case (Com.* v. *Brown),* 90 Va. 671, 19 S. E. 447, opinion by Lewis, P., First Wharton's Criminal Law (11th Ed.) page 592.

But it is said that even if this be good law, there is no evidence in the record to support it.

These things the jury might fairly have inferred:

Bradshaw knew that these officers had been looking for him, and when he heard them in the cook room he knew that they had come again and he must have thought for no friendly purpose, for it was then that he undertook to conceal himself on the upper cabin floor. On the preceding day he was seen to place his gun behind the wardrobe in the living room and it was there when last seen. There was no occasion for this woman or her little son to take it upstairs, or indeed, to touch it at all. He did have it on the upper floor and so in all human probability he took it with him in his flight and could have taken it but for one purpose and that was to use it if necessary. Gladys Buckner did not begin to protest until Boelte's purpose to search the upper floor became known, and that was not until he started up the stairs. When he did start he was at once shot dead and without warning. Bradshaw could not have

thought that he himself was in peril, for Boelte was apparently unarmed.

It is true that this officer at the moment became a technical trespasser, but one has no right to kill a mere trespasser for that offense alone than he has to kill any one else. The jury may well have thought that the accused shot to protect himself and not in the protection of the household or in protest against its intrusion, and that it was premeditated, deliberate and in conformity with a plan theretofore conceived.

This instruction was warranted by the evidence.

Exception is taken to the refusal of the court to give Instruction C, tendered on behalf of the accused. It reads:

"The court instructs the jury that if they shall believe from the evidence that the deceased, Herbert Boelte, and John W. Hatcher, as deputy sheriffs, went to the home of Gladys Buckner and attempted to search the said home without having the proper warrant to authorize such search, and that the said Gladys Buckner ordered Boelte and/or Hatcher not to go up the stairs of her home, and that the said Boelte, in defiance of the said orders from Gladys Buckner, proceeded to go up the said stairs, then he became a trespasser in the said home; and if the jury further believes from the evidence that Gladys Buckner, in an effort to prevent Boelte and/or Hatcher from going up said stairs, drew an axe and began screaming, Hatcher having drawn a gun and demanding that she not come on him, and that Boelte then proceeded up the stairs, and Will Bradshaw shot him in an effort to aid Gladys Buckner in the defense of her rights in the home, then they cannot find the defendant guilty of murder in the first degree."

For reasons stated, the evidence was sufficient to warrant the jury in returning a verdict of guilty of murder in the first degree. Moreover, material facts are omitted. It does not state that Bradshaw knew that the officers were looking for him; it does not state that he left the living room when he heard them in the kitchen; it does not state that he heard Gladys Buckner tell them that he had

not been seen since the preceding day, and it does not deal with the fact that he had his gun in his possession when he fled to the upper floor and the circumstances which made that probable.

We have seen that in an extreme case it may not be necessary for the court to instruct a jury as to the law governing manslaughter, just as it would not be necessary for the court to instruct a jury as to the law of first degree murder where the evidence established beyond question that the killing was without malice, unpremeditated and accidental, due only to the negligent performance of some lawful undertaking, and this though the indictment charged murder. It would be futile because a verdict of first degree murder would have to be set aside, and it would be misleading because the jury might construe it as an indication to do something which it had no right to do. But between these two extremes, the jury has wide latitude, and into that field most cases fall. It should be instructed as to the degrees of homicide and as to the punishment therefor provided by statute. This rule is universally applied unless the case is plain beyond perhaps.

"The determination of the grade or degree of homicide is a question for the jury." 2 Michie on Homicide, p. 1388.

"The sufficiency of the evidence on one hand to establish the wilful, deliberate and premeditated character of the act, or, on the other, to rebut the presumption of malice, is generally a question which lies peculiarly within the province of the jury." *Bryan* v. *Commonwealth,* 131 Va. 709, 109 S. E. 477.

"We have held in perfectly clear cases that the evidence was not sufficient to show malice, even where the jury had found to the contrary, but malice is a subjective condition of mind, discoverable only by words and conduct, and the significance of the words and conduct of an accused person, wherever there can be doubt about such significance, addresses itself peculiarly to the consideration of the jury." *Jacobs* v. *Commonwealth, supra.*

In *Webb* v. *Commonwealth,* 154 Va. 866, 152 S. E. 366, this instruction was given:

"The court instructs the jury that if they shall believe from the evidence beyond a reasonable doubt that at the time Webb fired the shot that killed Harold Vaden that Vaden's hand which held his gun was held by Ramsey so that he, Vaden, could not shoot Webb, and that it did not reasonably appear to Webb at the time that he was in danger of losing his life or suffering serious bodily harm at the hands of the deceased, then the accused cannot invoke the doctrine of self-defense, and they should find the accused guilty of some degree of homicide lower than murder in the first degree, and punish him as set out in the charge of the clerk in this cause."

In commenting upon it the court said: "The vice in the instruction is that it impinged upon the province of the jury whose duty it was, under the facts of the case, to determine whether the accused was guilty of murder in the first degree or of a lesser offense." *Langford* v. *Commonwealth,* 154 Va. 879, 153 S. E. 821. To the same effect is *Ballard* v. *Commonwealth,* 156 Va. 980, 159 S. E. 222; *Tucker* v. *Commonwealth, supra.*

Without undertaking to restate the evidence, we think that under the facts in this case the court should have fully stated the law of homicide; it should have instructed the jury as to the grades of the offenses and the punishments which the statute provides therefor. For this reason this case is reversed and remanded.

*Reversed and remanded.*

CAMPBELL, C. J., dissenting.