# Richmond

## EPHRIAM THOMAS v. COMMONWEALTH OF VIRGINIA.

March 3, 1947.

Record No. 3174.

Present, Holt, C. J., and Hudgins, Gregory, Eggleston, Spratley and Buchanan, JJ.

· The opinion states the case.

*Hill, Martin & Robinson,* for the plaintiff in error.

*Abram P. Staples, Attorney General,* and *Walter E. Rogers, Assistant Attorney General,* for the Commonwealth.

BUCHANAN, J., delivered the opinion of the court.

The defendant, Ephriam Thomas, was tried and convicted by a jury of murder in the first degree and his punishment fixed at death. He was sentenced on that verdict. We are asked to reverse the judgment because of insufficiency of the evidence and because the jury were not instructed on involuntary manslaughter.

The killing occurred on the night of February 2, 1946,

not long after eight o'clock. A short time prior to the killing the defendant hailed and got into a taxicab, then being operated by Frank Holloway, on the old Norfolk road near Suffolk. He had been drinking but was not drunk. He was carrying a .45 calibre semi-automatic army pistol which he had put under his belt when he left home. He got into the rear seat of the cab and told the driver he wanted to go to Saratoga Place. There was then no one else in the cab. They drove to Saratoga Place, where the defendant said he wanted to find a woman, but did not know her name or where she lived, and after driving around for sometime the driver, Holloway, started back to put the defendant out where he had picked him up. On the way he picked up another man near Main street who got into the front seat with the driver. Farther on he picked up two women, Lenora Hamlin and Ettis Worrell, who got into the back seat with the defendant. Lenora Hamlin sat next to the defendant, spoke to him and called him "Thomas." The cab then continued on down East Washington street to the Elks Club where the passenger in the front seat got out and Lenora Hamlin and Ettis Worrell got into the front seat, leaving the defendant alone in the back. Ettis Worrell sat next to the driver and Lenora Hamlin sat on the right. Either then or at some time after the two women got into the cab (the evidence does not specifically show), the defendant asked Holloway to take him back to Saratoga Place. Holloway refused because he said he was afraid of the defendant and unwilling to ride around with him any more in Saratoga Place where he had already driven him around aimlessly. He told the defendant he was going to take him back where he got him. The defendant then asked Holloway if he was not a taxi driver and supposed to take people where they wanted to go. Except for this conversation and Lenora Hamlin's speaking to the defendant when she and Ettis Worrell entered the cab, nothing had been said to or by the defendant before the shooting occurred.

The journey was resumed from the Elks Club, and as the driver was preparing to stop just before reaching the place

where the defendant was to get out, he slowed his cab down to about ten miles an hour and then, without warning, the defendant fired his pistol from the rear seat into the back of the right shoulder of Holloway, the driver. Just prior to the shot Holloway felt what seemed to him to be the defendant's knee pressing against the rear of the front seat against his back. When he was shot, Holloway opened the cab door, jumped out and ran behind a garage across the street. He then heard two other shots fired in rapid succession. The second shot struck Ettis Worrell on her left ear, carried away part of the lobe and grazed the left side of her head. The third shot struck Lenora Hamlin from the rear under her left ear and caused her instant death. After Ettis Worrell was struck she climbed across the body of Lenora Hamlin, got out of the cab and ran and the defendant was then still in the cab. There were no marks of bullets in the cab.

Such was the testimony of Frank Holloway and Ettis Worrell, the only two living eye-witnesses other than the defendant.

The defendant was found next day, about two o'clock in the afternoon, at the home of George Ricks on the old Norfolk Road where he had been living about three months. Ricks testified that the defendant left his home about eight o'clock the night of the shooting and returned between ten-thirty and eleven that night; that he was not drunk and talked rationally; that one of his guests heard of the shooting, went to the scene, came back and all of them were talking about it but the defendant gave no indication he knew anything about it; and when the officers came next day the defendant asked Ricks to tell them he did not live there.

The pistol used by the defendant was found in a field behind the home of Ricks, partially loaded, and other bullets for it were found in a shoe in defendant's room. When the defendant was arrested he denied any knowledge of the crime. He was then taken to the hospital and identified by Holloway and still he denied it. He was also identified at the trial by Holloway and Ettis Worrell. The day following his arrest he made and signed a confession in which he stated that he

gave the cab driver $5 before he stopped to let him out; that he kept asking for his change but the driver told him he had no change coming to him, that it took that to pay his fare; that "I got mad about my money, and was also drinking, so I pulled out the 45 pistol to scare him and the gun went off. After I shot several times I got scared and run down Ninth St., and crossed a field to 10th St. I dropped the gun in the field. I then came up 10th St. to where I was staying. I went in the house and sat down, talked to Rick, and his wife, also was there. I did not know I had killed a girl, and shot the cab driver until Irene came to Ricks house and was telling us what happened." He further said he bought this .45 calibre army pistol from a man in Suffolk about two months before the shooting; and that "When I shot the 45 automatic pistol, I only intended to *shot* once, but the gun kept shooting. That was one thing that scared me, and was one reason I jumped out of the cab and began running."

Except for Ricks, the substance of whose testimony is stated above, the defendant was the only witness in his own behalf. He repeated the statement made in his confession, with some variation, that he gave the cab driver $5, and was refused any change; that he then took his pistol and pointed it towards the driver and said, "How about my change, fellow?", and that the driver, seeing the gun through the mirror, suddenly applied his brake, causing the car to stop or slow up, throwing the defendant towards the front, and that his sudden impact against the back of the seat caused the pistol to fire; that it was not his intention to kill or hurt anybody, but he thought he would scare the driver into giving the change that was due; that so far as he knew, the several shots were fired due to the automatic action of the pistol; that after the pistol fired he was the first one out of the cab and he ran because he was scared. He admitted that he had denied any connection with the shooting until after the pistol had been found and he had been identified by Holloway and Ettis Worrell.

He was flatly contradicted by Holloway and Ettis Wor-

rell who testified that there was no conversation between the defendant and Holloway about any money; that the defendant gave Holloway no money; and that there was no sudden stopping of the taxi, or any stopping at all which could have caused the defendant to be thrown against the front seat. It is to be noted also that the defendant made no claim in his confession that he was thrown forward by any stopping of the cab. His claim on the witness stand that the several shots were due to the automatic action of the pistol and that his being thrown against the back of the seat was what caused the pistol to fire was also contradicted by his confession that he was mad about his money and intended to shoot once. It was also contradicted by the sheriff of the county who testified that the pistol used by the defendant would fire only once each time the trigger was pulled, and would not fire repeatedly by pulling the trigger and holding it back.

Such conflicts as were made by the defendant's testimony must, on familiar principles, be now resolved against him. The result is that by the evidence there is shown a wicked, wanton, wilful premeditated killing, ample to sustain the verdict of first degree murder.

Murder of the first degree is defined by the statute to be "any wilful, deliberate and premeditated killing." Code (Michie) Sec. 4393.

As stated in *Scott* v. *Commonwealth*, 143 Va. 510, 129 S. E. 360, "One of the canons of the criminal law is 'that a mortal wound given with a deadly weapon, in the previous possession of the slayer, without any or upon very slight provocation, is *prima facie* wilful, deliberate, and premeditated killing, and throws upon the accused the necessity of proving extenuating circumstances.'"

Here, leaving out the defendant's claim of accidental shooting (which was contradicted by the Commonwealth's evidence, by the confession of the defendant, by the physical facts and by its own inherent incredibility, and which was rejected by the jury), there was a complete absence of evidence of extenuating circumstances necessary to lower the

*prima facie* case of first degree murder made by the Commonwealth when it proved that the defendant without provocation shot and killed deceased with the pistol with which he had previously armed himself.

■ There is no conflict between the legal principle that a *prima facie* case of first degree murder is established when the Commonwealth proves, as it has here, a mortal wound given with a deadly weapon in the previous possession of the slayer without any or upon very slight provocation (*Scott v. Commonwealth, supra*), and that long established principle that every homicide is presumed to be murder in the second degree (*Adams v. Commonwealth*, 163 Va. 1053, 178 S. E. 29). The first result, or presumption, follows upon proved facts; the second from incomplete proof of facts. A meets B on the street, pulls a pistol from his pocket and shoots and kills him for no apparent reason. When that is proved, a *prima facie* case of first degree murder is established, and A must offer evidence in explanation if he would escape the penalty. In another case, B is found dead on the street. It is proved that A killed him. On that evidence alone a presumption arises that A is guilty of murder in the second degree. To prove him guilty of murder in the first degree, the Commonwealth must go forward with evidence to show that A's action was wilful, deliberate and premeditated. To overcome the presumption, A must introduce evidence to lower the grade of the offense or show legal excuse for his act.

■ The defendant contends here that he should not have been convicted of a greater offense than murder of the second degree because, he argues, there is a presumption that such was the degree of his crime and that the Commonwealth has not overcome this presumption by its evidence; in other words, that the Commonwealth did not prove that the defendant's act was wilful, deliberate and premeditated. But that contention is not valid. The wilful, deliberate and premeditated character of the act is established by the evidence of the manner in which the act was done. That is the legal result of what was proved. To argue, as the defendant

does, that a presumption of second degree murder holds because the Commonwealth's evidence does not show any provocation or explanation, is to argue that a man who kills for no cause is guilty of a lesser crime than one who kills for an insufficient cause.

Of course, malice either express or implied is an essential element in murder either of first or second degree (Michie's Digest Va. & W. Va. Rep., Homicide, Sec. 14, p. 38). The facts stated show both express and implied malice, as demonstrated by this analysis in *Scott* v. *Commonwealth*, *supra*, quoting from *Commonwealth* v. *Webster*, 5 Cush. (Mass.) 295, 52 Am. Dec. 711:

" 'Murder, in the sense in which it is now understood, is the killing of any person in the peace of the Commonwealth, with malice aforethought, either express or implied by law. Malice, in this definition, is used in a technical sense, including not only anger, hatred and revenge, but every other unlawful and unjustifiable motive. It is not confined to ill-will towards one or more individual persons, but is intended to denote an action flowing from any wicked and corrupt motive, a thing done *malo animo*, where the fact has been attended with such circumstances as carry in them the plain indications of a heart regardless of social duty, and fatally bent on mischief. And therefore malice is implied from any deliberate or cruel act against another, however sudden.' "

See also, *Clinton* v. *Commonwealth*, 161 Va. 1084, 172 S. E. 272; *Adams* v. *Commonwealth*, *supra*.

It was not required of the Commonwealth to show a motive or reason for the killing (*Oliver* v. *Commonwealth*, 151 Va. 533, 145 S. E. 307). Under the circumstances shown it is presumed to have been prompted by malice (*Bradshaw* v. *Commonwealth*, 174 Va. 391, 4 S. E. (2d) 752; *Mosby* v. *Commonwealth*, 168 Va. 688, 190 S. E. 152); and that it was wilful, deliberate and premeditated (*Scott* v. *Commonwealth*, *supra*; *Karnes* v. *Commonwealth*, 125 Va. 758, 99 S. E. 562, 4 A. L. R. 1509; *Stapleton* v. *Commonwealth*, 123 Va. 825, 96 S. E. 801). The burden was on the

defendant to explain (*Clinton* v. *Commonwealth, supra*). Fortunately, wanton murders like that shown by the evidence here are rare, but they have happened, and the law is not impotent to impose punishment to fit the crime because explanation of the abnormal act is not given. Such killing may only proceed "from a heart regardless of social duty and fatally bent on mischief", but this case is not the only example of such crime, as shown in our criminal annals. *Barbour* v. *Commonwealth*, 80 Va. 287, is another instance. There Jackson was walking along the road towards his home offending nobody. Barbour met him and asked him to go back and get a drink. Jackson declined, saying his family was alone and it was getting late and he must go on. Without anything more than that as provocation or explanation, Barbour thrust a knife into Jackson's throat and killed him. A verdict of murder of the first degree was sustained. And see *Bryan* v. *Commonwealth*, 131 Va. 709, 109 S. E. 477, holding that evidence for the Commonwealth of a similar nature, standing alone, made a case of murder in the first degree.

The defendant also assigns as error that the court did not instruct the jury on involuntary manslaughter. He says in his brief that he does not contend that he is guiltless, but that he could legally have been convicted only of murder in the second degree or involuntary manslaughter. That was not the position he took in the trial court. There, at his request, the court gave the jury this instruction:

"The Court instructs the jury to constitute murder in the first degree the evidence must clearly and distinctly prove, beyond any reasonable doubt, that the prisoner was not only incited to the killing of the deceased by malice, and deliberate wickedness of heart, but such killing must have been a wilful, deliberate, and premeditated act on the part of the prisoner; in other words, at the time of the killing the prisoner must have distinctly understood what he willed and intended to do; he must have also reflected, and deliberated, and premeditated that he would kill the deceased, or do her some serious bodily injury, the probable result of

which would be death. And if there be a reasonable doubt whether he had willed, and deliberated, and premeditated to kill the deceased, or do her some serious bodily injury, which would probably occasion her death, they ought not to find him guilty of murder in the first degree.

"If you believe from the evidence that Ephriam Thomas unlawfully shot and killed Lenora Hamlin, with malice aforethought, but without deliberation, premeditation or pre-concerted design to kill said Lenora Hamlin, you should find said Ephriam Thomas guilty of murder in the second degree, and fix his punishment at not less than five nor more than twenty years in the penitentiary.

"The Court instructs the Jury that if they believe from the evidence that the shooting was done accidentally, without any malice or intent to do bodily injury, they shall find the defendant not guilty."

It is true the concluding paragraph of this instruction was more favorable to the defendant than he was entitled to have it, but having asked and obtained it, and having elected to have the court tell the jury that his claim of accident, if believed, required a more favorable verdict than was actually the case, he cannot now be heard to complain. If it be assumed that his story of accidental shooting was sufficiently credible to be entertained by the jury, he would have been entitled to instruction on that offense. But he preferred to have the court tell the jury that if they believed what he testified to, he was not guilty of any crime.

*Tucker* v. *Commonwealth*, 159 Va. 1038, 167 S. E. 253, and *Bradshaw* v. *Commonwealth, supra,* were reversed because the jury were not instructed on manslaughter and there was evidence which entitled the defendants to have that crime and its penalty explained to the jury. The trial courts there disregarded that feature of the cases, and by rulings on instructions, in effect, excluded that element in both cases from consideration by the jury. That is not the situation here. In this case the court did deal with the theory of accident and at the defendant's request told the jury if they believed it the defendant was entitled to be ac-

quitted.  See *Oliver* v. *Commonwealth, supra,* for a similar example of invited and harmless error.

In his brief the defendant asks, "Who can say that if the jury had been properly instructed that they would not have found petitioner guilty of a lesser offense?"  Aside from his election to have the court tell the jury they should find him not guilty, instead of guilty of involuntary manslaughter, it affirmatively appears that the absence of such instruction did not affect the verdict.

The record shows:  "After the jury had deliberated for some time, the Court was requested by the jury in open court in the presence of the accused to instruct them on the length of time required for premeditation; whereupon, by consent of counsel for both the Commonwealth and the defendant, the court gave the following instruction:

"The Court instructs the Jury that to constitute a wilful, deliberate and premeditated killing, it is not necessary that the intention to kill should exist for any particular length of time prior to the actual killing; it is only necessary that such intention should have come into existence for the first time at the time of such killing, or at any time previously."

In addition, at the time the defendant was indicted for the murder of Lenora Hamlin, he was also charged in separate indictments with the malicious wounding of Frank Holloway and Ettis Worrell.  He was tried on all three of these indictments at the same time by the same jury on the same evidence.  On the malicious wounding indictments the court instructed the jury that, if warranted by the evidence, they might find verdicts of malicious wounding, unlawful wounding or not guilty.  In each case a verdict of malicious wounding was returned, which the defendant moved to set aside but afterwards withdrew his motions.  Such excuse as defendant offered for his conduct related to Holloway, who, he claimed, would not give him back his change.  None was offered for killing Lenora Hamlin except the excuse of accident.  This excuse the jury rejected, and properly so. The defendant admitted in his confession that he was mad and that he intended to shoot once.  His claim that the

sudden stopping of the cab caused him to fire was refuted by the Commonwealth's evidence that this did not happen, by his own confession and by the further evidence that the pistol would not have fired the second and the third times if he had not pulled the trigger. It was simply beyond belief by the jury or anybody else that the defendant accidentally fired the three shots in the manner and with the result shown by the evidence.

The Attorney General contends that in any event the defendant's testimony did not make a case of involuntary manslaughter so as to entitle him to any instruction on that offense. This on the ground that pointing a loaded pistol at the driver, with finger on the trigger, in a moving automobile, for the purpose of making him part with money, was an aggravated assault, under circumstances naturally tending to endanger life; and that killing resulting therefrom would be second degree murder. It is not necessary to decide the point, as we have disposed of the assignment on other grounds; but see 26 Am. Jur. p. 166; 2 Bish. New Cr. Law (8th Ed.) Sec. 689, p. 393; Annotation 5 A. L. R. p. 610; *State* v. *Weisengoff*, 85 W. Va. 271, 101 S. E. 450; *Goodman* v. *Commonwealth*, 153 Va. 943, 151 S. E. 168.

The verdict is well supported by the evidence, no prejudicial error has been shown, and the judgment of the trial court is therefore affirmed.

*Affirmed.*