# Richmond

ALBERT TUCKER V. COMMONWEALTH.

January 12, 1933.

Present, All the Justices.

The opinion states the case.

*A. S. Hester,* for the plaintiff in error.

*John R. Saunders, Attorney-General,* and *Edwin H. Gibson* and *Collins Denny, Jr., Assistant Attorneys-General,* for the Commonwealth.

HUDGINS, J., delivered the opinion of the court.

Albert Tucker was convicted of murder in the second degree and sentenced to eighteen years in the penitentiary. In his petition for a writ of error he complains of several rulings of the trial court, only two of which merit consideration.

The first error assigned is to the refusal of the court to postpone the hearing a few days in order that counsel might make preparation for trial. Such motions are addressed to the sound discretion of the trial court, and only when the record shows that there has been abuse of this discretion will this court interfere with its ruling.

The facts and circumstances under which the motion was made are as follows: About midnight May 30, 1931, one D. H. Armistead was shot and killed by the accused, a colored man, in a place of business operated by the accused and his brother, James Tucker. When the officers arrived at the place shortly after the killing, the accused and his brother gave them the names of six men whom they claimed were the only persons present when the shooting occurred. Subsequently, the officers were informed that one James Claxton, whose name was not mentioned by the accused and his brother, was also an eyewitness to the killing.

After the accused was arrested, he employed as his counsel Mr. Royston Jester, Jr., of the Lynchburg bar. At the preliminary hearing Mr. Jester appeared with a court reporter and all the evidence introduced was preserved. James Claxton was not present at this hearing. It seems that soon after the shooting, either before the preliminary hearing or shortly thereafter, the accused sent for Claxton and said to him, "you quit going around here drinking liquor and telling your damn lies about this thing; you weren't even in the house when the shooting was done." Claxton was also warned by the accused that he had better get away from Lynchburg, which warning he heeded and left for West Virginia. A police officer of the city of Lynchburg went to West Virginia, saw Claxton and induced him to return for the purpose of testifying in this case. After his return, the accused, who was on bail, saw him and told him that he had the case beat unless the Commonwealth secured additional witnesses, and, with a foul oath, added that he had killed a white man and he would "kill a nigger the same way." Claxton left the accused under the impression that he was not going to testify against him. A few days thereafter the accused saw Claxton and again the subject of his testimony was discussed.

The indictment was returned by the grand jury on the 6th day of July and the case was set for trial on the 10th. On

the return of the indictment the accused was confined in jail and there remained until the day of trial.

The Commonwealth's attorney was informed of threats made to its witness, James Claxton, and took the precaution to have him watched so that he would not thereafter be tampered with. It further appears that on July 7th the officers caught James Tucker and Silas Flood offering James Claxton money to leave the State and not testify in the case. They were immediately arrested, charged with contempt of court, and their trial set for the next day, July 8th, at three, p. m. As soon as Mr. Jester, attorney for the accused, was informed that the brother of his client was attempting to bribe the Commonwealth's witness he notified the court and the accused that he would retire from the case. Mr. A. S. Hester, of the Lynchburg bar, was called to the defense of James Tucker and Silas Flood and as soon as he was employed he had the contempt charge against these parties continued from the afternoon of July 8th to the morning of July 9th. During this interview with James Tucker he was engaged to defend the accused.

On July 9th Mr. Hester was in court defending the charge of contempt until time for lunch. After lunch he went over the evidence in this case with Mr. Jester and obtained the benefit of his preparation for trial. Late that afternoon he made some attempt to see James Tucker, but was told that he "would not be down" until next morning.

On the morning of July 10th, an hour and a quarter before the trial, Mr. Hester had a conference with Albert Tucker and some of his witnesses. As soon as the case was called he made the motion to postpone trial until a later day in the term, on the ground that he had not had sufficient time to prepare the case and that he had not interviewed all of the witnesses for the accused. In overruling the motion the court said:

"This is a very peculiar state of affairs. The court is not disposed to do other than to see that the prisoner has a fair trial, but the Commonwealth is entitled to a fair trial

too. This man's brother, whom you say he relied on, and his friend have, ever since this witness has been here, been trying to persuade him to leave the State and not testify, so the court had to exercise its power to protect its own integrity and bring this man up here and put him in jail, also his friend. I have put them in jail and kept them there, the case has been fixed for trial, and it is this man's brother's own conduct that has taken Mr. Jester out of the case, and I do not see why the court should continue the case and leave this man Claxton subject to be trifled with by these people again, so I will not continue this case."

Mr. Hester accepted employment on the afternoon of July 8th. At that time he knew that the case was set for trial at ten o'clock on July 10th. The only engagement he seems to have had during the intervening time was the trial of a misdemeanor (the contempt charge). He knew that his client was in jail and if he had wanted an interview with him prior to the day of trial with a little effort he could have obtained it, even after visiting hours at the jail if the custodian had denied him an interview, the trial judge was available and an order from him, or even a telephone message, would have secured it. A person charged with a crime is entitled to consultation with his attorney and a reasonable time in which to prepare the case for trial; denial of these rights is a denial of a fair and impartial trial. Due preparation includes a reasonable opportunity to interview witnesses for the accused.

In the case at bar all of the eyewitnesses to the shooting were known and their testimony (except that of James Claxton) had been taken down, typewritten and studied by Mr. Hester. The names of the witnesses had been given him by Mr. Jester and if he had thought it necessary to see them before the morning of July 10th he could have ascertained where they lived through James or Albert Tucker, both of whom were in jail. While the period between the time of employment and the time of trial was short, reasonable diligence on the part of Mr. Hester would have

procured an interview with his client and the witnesses; if this diligence had failed he would have been entitled to a continuance as a matter of right. Persons engaged in the practice of law, to properly represent their clients, cannot always observe the eight hour rule. While the attorney did not interview all of the witnesses before they were called to the stand he had before him the typewritten statements given at the preliminary hearing and neither the examination-in-chief nor the cross-examination before the jury indicate any variation from their former testimony.

In addition, the situation which confronted the trial court was brought about through the actions of the accused and his brother, James Tucker, who at his request was aiding in his defense. The accused himself had induced James Claxton to leave the State. On his return shortly before the indictment was found and once on that day the accused had threatened or attempted to intimidate Claxton, the main witness for the Commonwealth, and on the day after the indictment was found James Tucker, acting in behalf of the accused, had sought to bribe Claxton, with the result above noted. While the action of James Tucker was the immediate cause of Mr. Jester's retiring from the case, his action (Tucker's) was only in furtherance of a contemptible scheme of defense which the accused himself had begun.

 Under these circumstances, we cannot say that the trial court has abused its discretion in the absence of affirmative evidence showing that the accused has been prejudiced. The record shows that every eyewitness whom the accused or his friends stated was present was called, either by the Commonwealth, the court, or the accused, and that they were examined and fully cross-examined by the attorney for the defense.

The jury rendered their verdict late on the day of July 10th; the motion to set aside the verdict was made, docketed and, at the request of the accused, continued until a later day. If there was in existence any evidence in behalf of the accused which was not produced at the trial his

brother and his attorney had ample opportunity to bring it to the attention of the court before the motion was passed upon. The record does not show that this ruling of the court was prejudicial.

While there are substantial grounds for a difference of opinion as to the warrant of law for the Supreme Court of the United States to take jurisdiction, in the case of *Ozie Powell, etc.* v. *State of Alabama* (U. S.), 53 S. Ct. 55, 60, 77 L. Ed. —, decided November 7, 1932, as indicated by the dissenting opinion of Mr. Justice Butler, concurred in by Mr. Justice McReynolds, there can be no dissent from the correctness of the following statement found in the majority opinion:

"It is true that great and inexcusable delay in the enforcement of our criminal law is one of the grave evils of our time. Continuances are frequently granted for unnecessarily long periods of time, and delays incident to the disposition of motions for new trial and hearings upon appeal have come in many cases to be a distinct reproach to the administration of justice. The prompt disposition of criminal cases is to be commended and encouraged. But in reaching that result a defendant charged with serious crime must not be stripped of his right to have sufficient time to advise with counsel and prepare his defense. To do that is not to proceed promptly in the calm spirit of regulated justice but to go forward with the haste of the mob.

"As the court said in *Commonwealth* v. *O'Keefe*, 298 Pa. 169, 173, 148 Atl. 73, 74:

"'It is vain to give the accused a day in court, with no opportunity to prepare for it, or to guarantee him counsel without giving the latter any opportunity to acquaint himself with the facts or law of the case.'"

Both Mr. Jester and Mr. Hester are experienced criminal lawyers. The accused was not confined in jail until four days before trial. Mr. Jester was thoroughly familiar with all aspects of the case. He gave Mr. Hester the full benefit of his preparation, including the written evidence taken

at the preliminary hearing. That evidence and that in this record shows no unusual complications. The law applicable was simple and should not have required much time in the preparation of instructions. We make this statement notwithstanding later discussion will reveal that the Commonwealth departed from the usual practice in this State in requesting certain instructions, but that departure was instantly detected by defendant's counsel and due exception noted.

The other assignment of error deals with instructions. Number 1 reads thus:

"The court instructs the jury that every homicide with a dangerous weapon in the previous possession of the slayer is presumed to be murder in the second degree, and the burden is upon the Commonwealth to raise it to murder in the first degree, and *upon the defendant to prove that the killing was justifiable, or in self-defense.*" (Italics supplied.)

By instruction No. 7 the jury were told that in the event they found the accused guilty of murder they should state the degree and fix the punishment within the limits prescribed by the statute for that degree, and then stated the punishment prescribed for the different degrees of murder.

 The vice in these instructions was in the failure of the court to state in instruction No. 1 that the burden was on the accused to reduce the presumption of murder in the second degree to voluntary manslaughter, and in instruction No. 7 the failure to tell the jury that in the event they should find the accused not guilty of murder in either degree they could find him guilty of voluntary manslaughter and fix the punishment prescribed by statute therefor.

The testimony of James Claxton was to the effect that about midnight on the day in question he and D. H. Armistead entered the accused's place of business and bought a pint of whiskey. "They all passed it around, we stayed there and they taken a drink, I taken one little glass half full and when we finished drinking I goes in the third room

to get my shine, and when I walked in the door this white fellow and 'Fats' (the accused) and several more followed me, and when he got in the room he (the deceased) pulled out his pistol and shoots down in the floor, and when he shoots down in the floor everybody commenced hollering 'white folks, don't shoot me,' and he threw his pistol up like that (indicating) and said 'I will kill every son-of-a-bitch in here,' and he kind of smiled and put his pistol back in his bosom. By that time everybody disappeared out of the house and I thought everything was over, but in a few minutes 'Fats' ran in and shot and Jim Tucker ran behind him and said 'now you done played hell,' and I got off the stand and walked out to the corner and lit out."

The undisputed evidence is that the accused, immediately following the shooting by the deceased, ran across the street and borrowed a pistol, stating that he wanted it to protect himself and his place of business from a holdup.

■ Even the testimony of Claxton shows that the deceased, by his threats and the shooting scared the accused out of his place of business and that within a few minutes thereafter he returned and found the deceased where he had left him and immediately fired the fatal shot.

If the accused had shot the deceased when he first drew his pistol, made the threats and shot into the floor, he would have been guilty of no crime. In other words, at that time the deceased furnished sufficient provocation for the accused to have killed him in self-defense. When the accused returned to his place of business, as he had a right to do, he found the deceased still there, and, according to the testimony of some of the witnesses, with a pistol in his hand. Under the circumstances, it was for the jury to say whether the killing was murder, manslaughter, or self-defense. The testimony introduced by the defendant, if true, established a clear case of justifiable homicide. In other words, the evidence would have supported a verdict of either murder, voluntary manslaughter, or acquittal. By the instructions

given, the jury was forced to find the accused guilty of murder or not guilty of any crime. This was prejudicial error.

█ It is held by the Federal courts and the majority of the State courts that if the evidence introduced by the prosecution establishes murder and the evidence in behalf of the accused, if believed, establishes justifiable or excusable homicide, a refusal of the trial court to give an instruction on manslaughter is reversible error. *Sparf* v. *U. S.*, 156 U. S. 51, 15 S. Ct. 273, 39 L. Ed. 343; *Davis* v. *U. S.*, 165 U. S. 373, 17 S. Ct. 360, 41 L. Ed. 750; *Bandy* v. *State*, 102 Ohio St. 384, 131 N. E. 499, 504, 21 A. L. R. 594. In the latter case the Ohio court reviewed many cases dealing with the question and finally summarized its conclusion as follows:

"So far as generalizations are possible in case of murder in the first degree, it may fairly be said that in murder in the first degree, where there is charged an unlawful killing, intentionally done, with deliberate and premeditated malice, the general rule would be that the lesser degrees would not only be included in the formal charge, but suggested or supported by some of the evidence in the case, and that therefore a refusal to charge upon the lesser degrees should be the exception. Whereas, in cases of murder in the first degree, where an intentional killing was charged in the commission of some felony enumerated in the statute, there would doubtless be a more equal division as to whether or not the evidence showed any lesser degree than the one literally charged. Probably in this class of cases it might be said that the lesser degrees would be the exception."

See, also, *State* v. *Maud Yargus*, 112 Kan. 450, 211 Pac. 121, 27 A. L. R. 1093.

█ Whatever the rule may be in other jurisdictions, in this State Code sections 4918, 4920 and 4393 have been held to be *in pari materia* and should be read together. Judge Keith, in *Burton & Conquest* v. *Commonwealth*, 108 Va. 892, 62 S. E. 376, 379, in commenting on the identical provisions in the Code of 1887, said:

■ "Our jurisprudence, in this and in other respects, may be amenable to criticism of schoolmen and logicians, but subjected to the test of actual experience it has appeared in practice to be well that the law, after framing definitions and formulating rules of conduct, should allow to courts and juries, in their application and enforcement, a certain latitude and discretion. And so it comes to pass that a man may be indicted for murder of the first degree by the various means embraced in the statute, the evidence adduced may tend to the proof of the offense named in the indictment and none other, and yet the jury, acting under this discretion with which they have been clothed by the law, may find the offender guilty of a less offense. And it is well in practice that it should be so, else, owing to the tenderness of juries and their reluctance to impose the highest penalty, many crimes would go wholly unpunished, and thus the rigor of the law would tend rather to the promotion than to the prevention of crime."

In this case we are of opinion that an instruction on manslaughter should be given; that the judgment should be reversed, the verdict of the jury set aside, and the case remanded to the Corporation Court of the city of Lynchburg.

*Reversed and remanded.*