# Richmond

## LaVozier LaMarr v. Commonwealth of Virginia.

April 23, 1945.

Record No. 2936.

Present, All the Justices.

The opinion states the case.

*Thomas H. Reid, Clyde W. Cooper* and *Jas. G. Martin & Son*, for the plaintiff in error.

*Abram P. Staples, Attorney General*, and *V. P. Randolph, Jr., Assistant Attorney General*, for the Commonwealth.

HOLT, J., delivered the opinion of the court.

LaVozier LaMarr was the manager of a colored USO club in Portsmouth. On the evening of March 6, 1944, he

killed Alvin Williams, also colored. In due course he was indicted for murder, was convicted by a jury of involuntary manslaughter, and on August 11, 1944, sentenced to five years in the penitentiary.

At 7:59 in the evening, Harry C. Rudd, who was a city police officer, was summoned to the club by a radio message. Upon his arrival he found that Alvin Williams had been hit on the head with a club and taken to a hospital. He went to see Williams there and found his head had been split from crown to spinal column. At 9:30 that night Officer Whitehurst called up Rudd and told him that Williams was dead. LaMarr had hit Williams with a table leg and had it in his hand on the occasion of Rudd's first call.

On February 26, 1944, LaMarr had sworn out a warrant against Williams in which he charged that Williams had drawn a knife on him and had used abusive language in the club. That warrant was still outstanding and had not yet been served.

Flora Farrell was the check clerk at the club. She said that Williams came to the checkroom and asked her where Ruth Weston was, and that in the course of the conversation he used foul and abusive language, which she reported to Mr. Johnson, assistant director of the club and who was also a director of the USO club in Alexandria. His duty was to carry on the administration of the club and to maintain order. He said that in order to protect Ruth Weston, who was a girl friend of Williams, LaMarr had taken her home on three occasions, and that Williams behaved on sundry occasions improperly—he would curse and not take off his hat.

In response to this call from Flora Farrell, Johnson spoke to Williams and told him that he had already been barred from the club—that "Mr. LaMarr barred him from the club for using profane language and refusing to pull his hat off on the previous night." Johnson tells us Williams walked to the door, flung it open and invited him out to fight. He tells us that "I went to the flag pole (in the yard) and stop-

ped. He went into the street." Johnson then said to a boy: "Get Mr. LaMarr. He is in the office. I am having trouble." Williams had a knife in his hand and was cursing. LaMarr came out in answer to this request and later went back into his office, and on this occasion picked up a table leg and returned. "Williams ran out into the street and he must have picked up a brick at that time." He came back into the vestibule, using foul language and, as he started to go out, he moved to throw the brick and LaMarr hit him.

Johnson weighed 220 pounds; he admitted that Williams was a small man. He followed Williams out into the yard to protect himself. He was asked if Williams had a brick in one hand and a knife in the other and said: "He could have."

The substance of this testimony is that Williams had made himself objectionable, had been ordered out and had gone out; that Johnson, who weighed 220 pounds, had followed this little darkie into the yard to protect himself, and sent to LaMarr for help. LaMarr met Williams, returning, in the vestibule and there struck the fatal blow. It is not entirely clear from Johnson's evidence whether Williams then had both a knife and a brick in his hands. He said that "he could have" had them, and that he did have both of them at the same or at different times.

Oscar Savage worked at the USO club. He found a knife in front of the doorstep by the hedge on Thursday following Tuesday, but at the time he found it he told "no one there but myself."

Ruth Weston testified. She said that both LaMarr and Johnson had been taking her home because of their promise to her parents, but that she had no love affair with either of them. She was asked: "Would he (LaMarr) put Alvin out of the car first and take you home; is that right?" And she answered: "Sometimes."

She was asked if there was any difficulty between her and Williams and answered that there was not—"no more than just little private affairs." This girl was then sixteen years old.

Moses Gibson, a letter carrier, was next called. He was chairman of the board of managers of this club and said that LaMarr's reputation was very fine.

Arthur Owens knew LaMarr and during the past sixteen or twenty months had been in contact with him at least half dozen times, and he said that his reputation seemed to be excellent.

A. B. Hill was chairman of the Portsmouth USO council 1. He said that LaMarr's reputation was good.

Charles Wharton was regional supervisor of the USO, with headquarters in Atlanta. He said that LaMarr's reputation was good.

W. E. Mount is director of this Portsmouth club. He also testified as to his good reputation.

Admiral Gygax said that he would believe LaMarr under oath, and Lieutenant Jones testified to the same effect.

LaMarr is a native of Augusta, Georgia; he is married and is 34 years old. He had a special degree in college boys' work from New York University and had worked at the Harlem Boys' Club of New York City. His duty at the Portsmouth USO Club was "to make it pleasant for service men and war production workers and to keep them well." He said that he had a lot of trouble with Williams, who would curse and swear when at the club.

On Tuesday, the night of the homicide, there was scheduled a War Production Workers' dance. On that occasion he asked Williams to take off his hat but Williams cursed him and refused to do so. It was then that LaMarr told him that unless he behaved he would call the police. It was on this night, when he was in his office, that some one came up and told him that "Mr. Johnson wants to see you because Alvin Williams is out here giving him trouble." He went out and told Williams that he had to leave, and Williams said: "I have been looking for you and I am going to get you." Some one told him that Williams had a knife. Williams left and turned to come back. Johnson then said to him: "Look out, here he comes with a brick." In the meantime LaMarr had gone back into his office, picked up a

table leg and called the police. LaMarr then went into the vestibule and met Williams, who turned to throw a brick at him, and it was then that he struck Williams in self-defense.

When asked how he managed to hit Williams on the back of the head when Williams was advancing upon him, he answered: "Maybe he cringed or something." Again when asked if Williams was near the flag pole when struck, he said: "No, he was not near the flag pole. He was right outside of the vestibule." Again he said "he was in the vestibule threatening to hit me and I hit him."

From this it appears that the accused, who weighs between 172 and 174 pounds, together with his friend, Johnson, who stood by to help and who weighed 220 pounds, in self-defense struck this boy with a table leg in the back of his head and split it from crown to spinal column. The boy was seventeen years old, five feet high, physically frail and weighed 111 pounds.

For the Commonwealth, Claudia Rodgers testified. She is an aunt of Alvin Williams and had raised him. She tells us that he was in his seventeenth year. When asked if he had a pocketknife, she said: "I know definitely he didn't have one."

Christine Henderson next testified for the Commonwealth and said in part:

"I was in the social hall at first and I came out to the lobby and I saw Alvin standing near the door, and I didn't say anything then, so I went into the lobby and sit down and got a magazine and began reading, and so then I saw—I noticed he was talking rather loud and I didn't see anybody else talking to him, and then I took it for granted that he was arguing with somebody and finally he just stopped since didn't anybody say anything to him, and he walked out of the door, and when he started out I saw Mr. LaMarr rush out of the office with a stick, a table leg, in his hand, and when I saw him draw back to hit I didn't look any more."

This is from her cross examination:

"Q. Don't you know the front of the club is lighted?

"A. Yes.

"Q. Was there a light out there that night?

"A. I don't know, because when I saw him draw back I got scared and I turned around.

"Q. Who drew back?

"A. Mr. LaMarr.

"Q. Where was he when he drew back?

"A. Just at the door.

"Q. Was he in the door of the vestibule?

"A. The vestibule.

"Q. What was Williams doing?

"A. He had gone out of the door.

"Q. Was he completely outside?

"A. Yes."

Louise Graves saw Williams going out of the door; LaMarr ran after him and struck him when he was near the flag pole and when his back was towards LaMarr. She saw no brick in Williams' hands and would have seen it had it been there.

Alice Bowser was another witness. As she was going into the club she met Williams coming out. As she got into the room, she met LaMarr coming out with a table leg and said that LaMarr followed Williams and struck him in the back of the head with the table leg, and that he fell near the flag pole which stands in the courtyard. Alvin Williams when struck had his back to LaMarr. She saw neither brick nor knife.

Ethel May Clark met Williams as he was coming out of the building. She next saw LaMarr coming out of his office behind Williams. She saw him strike Williams from behind. He fell on his face, and Williams was then at the bottom step. LaMarr was moving rapidly. Williams fell by the flag pole.

From this a jury might have believed and must have believed that Williams was an unruly youth who had been told by LaMarr to keep away from the club. This he did not do but returned in the evening on the day of his death.

He was ordered to leave and did leave but started to come back and was chased out again. LaMarr followed him and struck him down in the courtyard, probably by the flagpole and certainly after he had reached the bottom step of the outer door. Whatever may have been his previous conduct he was then going. That LaMarr followed him, struck him in the back of the head and killed him makes the offense at least involuntary homicide; that he was acting in self-defense no jury could have believed.

Without elaboration, we cannot set this judgment aside because it is unsupported by adequate evidence. It is amply supported.

*Affirmed.*