# Richmond

## JOHNNIE JONES V. COMMONWEALTH OF VIRGINIA.

January 12, 1948.

Record No. 3304.

Present, Hudgins, C. J., and Gregory, Eggleston, Spratley, Buchanan and Miller, JJ.

The opinion states the case.

*M. Anderson Maxey* and *Thomas L. Woodward,* for the plaintiff in error.

*Abram P. Staples, Attorney General,* and *Ballard Baker,* for the Commonwealth.

MILLER, J., delivered the opinion of the court.

On Sunday afternoon, September 22, 1946, Eddie Grimes was killed in the city of Suffolk by a shot fired from a 38-calibre pistol. Johnnie Jones was indicted for the homicide, pleaded not guilty, and was tried before a jury. He undertook to establish self-defense as a justification for the killing. The trial resulted in a verdict of conviction of murder in the first degree, and punishment fixed by the jury at life imprisonment. From the judgment of the court upon that verdict this writ of error was obtained.

Without the aid of the plat and several pictures of the streets, houses, and other physical surroundings introduced in evidence, a detailed description of the scene of the killing would be confusing. However, a brief statement of the location of the respective homes of deceased and accused, and where each was standing when the fatal shot was fired is necessary.

Culloden Street and Crumpler's Alley intersect at right angles. The former extends north and south, the latter

east and west. At the southeast corner of this intersection a two-story three-family tenement faces on the east side of Culloden Street and extends back eastwardly along the south side of Crumpler's Alley. There are three apartments in this structure. Each has a separate entrance and a front and back porch separated from the others by railings and partitions. From the back porch of each are two or three steps descending to a small court or yard in common that opens to the north along the south side of Crumpler's Alley. This court or yard is almost enclosed by houses and a fence except where it opens on Crumpler's Alley. A man named Willie Davis lived in the apartment next to Crumpler's Alley. Here he operated a restaurant on the first floor and had living quarters on the second floor. The accused lived in the next apartment immediately to the south. The steps of his back porch are about eighteen feet from the southern edge of Crumpler's Alley.

The home of the deceased is located upon Brown's Lane. It is in a southeasterly direction from that of the accused and at a distance of about one hundred and fifty feet across an ill-kept and rubbish-strewn area. It is possible to see Grimes' front porch from the steps descending into the court at the rear of accused's abode. After one leaves Grimes' home and proceeds northwardly to and thence westwardly along Crumpler's Alley toward the back yard or court, the buildings prevent him from being seen by anyone on the rear steps of accused's home. Within a few feet after leaving Grimes' porch he cannot be again seen until he comes to and abreast of the small court at the rear of the three-family tenement.

Immediately before the killing, deceased approached the scene by the above route. He was fired upon at the north line of the court or back yard of accused's home very near to or upon the southern edge of Crumpler's Alley about eighteen feet from accused's back steps. Accused was standing on his back steps when he fired.

The deceased, Eddie Grimes, was of a belligerent nature, young and physically stronger than Johnnie Jones. About

a month prior to the killing he had unjustifiably provoked a quarrel in the home of the accused, and in vile and profane language threatened to kill him. On that occasion, Jones sought the protection of an officer of the law who took from Eddie Grimes a knife with which he, Grimes, had threatened to cut the throat of the accused. Thus the accused well knew of the dangerous attitude and character of the deceased.

On the afternoon of the homicide, accused and George Tyler were in the restaurant operated by Willie Davis. Tyler and Jones had been in an argument concerning the amount Jones was indebted to Tyler as a result of a game of cards that had just been played. Some profane language had been used by these two but no blows had been passed. The argument seemed about concluded as Eddie Grimes entered the restaurant. Accused had just stepped out of the front door and was then seated in a swing on the porch, but where a conversation in the restaurant could be heard. When Eddie Grimes came into the restaurant, he learned of the argument and, without reason or invitation, injected himself into the matter. He asked Tyler what the trouble was and upon hearing Tyler's version, immediately used disgusting and threatening language about the accused. Prefaced by foul and unprintable descriptive terms, he remarked, " * * * if he owed me I would take a stick and kill him."

Accused heard this and stepped back into the front door. He said to the deceased, "Eddie, you attend to your business and I'm attending to mine, you ain't got nothing to do with me and George talking."

Deceased's reply was, "Shut up! Shut up! If you say another thing I will kill you. * * * ." Then followed other vile and profane language from the deceased. At this moment, Willie Davis, proprietor of the restaurant, ordered both men from the premises and they departed together.

When Jones and Grimes left, it being necessary for the accused to pass down the front steps from Davis' porch to get to the steps of his own porch, he was struck by Grimes,·

knocked to the earth, and there beaten and kicked as he lay upon the ground. That unprovoked and vicious attack was testified to by accused and another witness.

The witness, Junius Pitts, had this to say with reference thereto:

"Q. When you got to Culloden Street, what did you see?

"A. I saw Eddie. Eddie had Johnnie down on the ground beating him.

"Q. How many times did he hit him?

"A. I don't know. H kicked him some two or three times.

"Q. Where did he kick him?

"A. He kicked him on the side of the head.

"Q. What happened then? Tell the jury what happened.

"A. He kicked him on the side of the head and I walked up and caught Eddie by the hand and told him to quit and go on off. Tyler had him and told him the same thing.

"Q. What did Jones say to him?

"A. He said, 'Don't hit me any more, Eddie.'

"Q. Let's go back. You say you told Eddie Grimes to leave him alone?

"A. Johnnie said to Eddie, 'Please, Mr. Eddie, don't hit me any more. You have done and beat me enough.'

"Q. Where was he at that time?

"A. He was on the ground. Eddie kicked him on the side of the head two or three times."

After bystanders had prevailed upon deceased to desist from his attack, the accused and this same witness heard the deceased say that he was going to kill the accused. The threat to kill was couched in language which was foul and offensive, but with intent unmistakably clear.

The deceased proceeded immediately to his home on Brown's Lane. The accused went into his apartment, secured his pistol, and returned to his rear steps where he con-

tinued to stand. He explains this action by saying that he expected Grimes to return and try to kill him and that he preferred not to be caught in his house.

Within five to fifteen minutes, deceased did return. He walked northwardly from his house to the eastern end of Crumpler's Alley, about one hundred and twenty-five feet from accused's home. Here he hurriedly turned and proceeded westwardly on Crumpler's Alley toward the court at the rear of accused's porch. He may have been seen by the accused as he left his home on Brown's Lane, but immediately thereafter he was obscured from view. As he approached along Crumpler's Alley, he was hidden by the houses facing thereon. When he entered this alley he was heard to again proclaim, " * * * somebody has got to die." This remark by deceased, made only a few seconds before he was killed, was testified to by John Davis who had seen the fight a few minutes previously. The threat and manner of the deceased as he turned and proceeded westwardly on Crumpler's Alley toward the scene of the killing impressed Davis. Though he could not then see Jones, he called to him and warned him that the deceased was coming and might kill him.

The testimony of this witness, who was standing near the eastern end of Crumpler's Alley with regard to the hurried return and threat by deceased is as follows:

"Q. Tell us where you were at the time?

"A. At the back end of the lane standing in front of Fred Ridley's house.

"Q. Did you see Eddie Grimes on the way to the place of the shooting?

"A. Yes, sir.

"Q. Tell the jury what you saw and heard.

"A. * * * He came back in a hurry and I said, 'What is the matter with you?' He said, 'God damn it, somebody has got to die.' In the meantime he went up the alley a little further, and when he got by Johnnie Jones' house, he must have saw him. I didn't see Johnnie Jones, but I

could see Eddie, and he got up there and stopped, and had his hand in his pocket, and I said, 'Look out, Johnnie Jones, he may shoot you,' like that, and I thought he had something in his pocket, and that is the time I heard the gun go off."

The shots sounded almost simultaneously with the call from John Davis, to "look out, Johnnie Jones, he may shoot you."

In this setting, and colored by these events, the alleged overt act on the part of the deceased relied upon by accused as the immediate justification for the killing is as follows: When the deceased saw Jones he immediately stopped about eighteen to twenty-four feet from him with his right hand in his trousers' pocket, made a turn toward the accused, and placed his left hand over his right pocket as if to draw something therefrom. This movement is testified to by the accused and by Grady Wynne, a witness for the Commonwealth. On cross-examination, Wynne testified as follows:

"Q. That is, he had his right hand in his pocket as I have indicated and he took his left hand and put it over his right pocket on the outside of his trousers as if to draw something from it?

"A. Yes, sir."

The accused's testimony as to the overt act by Grimes is, " * * * and when I stepped on the lower step, about that time I saw Eddie when he come up. When he come up there he had his hand in his pocket walking fast, and when he stopped he said, 'Yes, there is the God damn * * * that I am going to kill', and then I looked around and he was about to get his hand out of his pocket, and I just tried to keep him from killing me since he promised to kill me."

The accused had immediately subsequent to the fight armed himself with a deadly weapon and taken his stand

upon his rear steps. This may have been, as contended by the Commonwealth, to perpetrate a premeditated and deliberate killing. However, he remained upon his own premises where he had a right to be. That he may have taken this stand on his steps, and not in the house, in order to better defend himself from an expected attack is not incredible. It is unquestionably true that in a few minutes the deceased returned again to the scene of his previous attack upon Jones. He approached voicing menacing threats upon the life of the accused.

The reason and purpose of accused in standing on the steps at the rear of his home and the necessity for his subsequent acts were matters for the determination of the jury under instructions upon both theories of the case.

From that position, as deceased stopped, turned toward him and put his hand to his pocket, accused fired two shots in rapid succession. The deceased was then on the south edge of Crumpler's Alley, or just south of the alley in the court. The witness, Wynne, says that the deceased was between the two houses but he was unable to see whether he had stepped partially into the court or was still upon the concrete sidewalk.

The above facts and circumstances constitute sufficient evidence upon which to base a finding of murder in the first degree, but reasonable men might conclude that the accused acted in self-defense. That the jury be correctly and sufficiently instructed on each theory is imperative and necessary.

Instructions No. 1 and 2 given at the instance of the Commonwealth define murder in the first and second degree. Instruction No. 5 is explanatory of No. 1. As there was ample evidence to support these instructions, the contention that they should not have been given is without merit.

For the same reason, the part of the sixth assignment of error—that the verdict should be set aside as contrary to the evidence—is not well-founded.

Some minutes elapsed after the accused secured the

pistol and took his stand upon his steps before the shooting occurred. His intention in so doing is of grave importance. If for the purpose of deliberate killing, then the contention of the Commonwealth is sustained. The intention to kill need not exist for any fixed period of time to constitute murder in the first degree. *Bradshaw* v. *Commonwealth*, 174 Va. 391, 4 S. E. (2d) 752. But if accused reasonably apprehended that he was to be attacked and serious bodily harm inflicted upon him, he had the right to arm himself for necessary self-defense. *Stapleton* v. *Commonwealth*, 123 Va. 825, 96 S. E. 801.

The objection to Instruction No. 6 given at the instance of the Commonwealth is well-taken. It is as follows:

"The Court instructs the jury that the law of self-defense is the law of necessity, or apparent necessity, and that to make out a case of self-defense in a case of homicide, the accused *must show to the jury* that the defense reasonably appeared to the accused to be necessary to protect his own life, or to protect himself against serious bodily harm; and that with regard to the necessity that will justify the slaying of another in self-defense, the accused must not have wrongfully occasioned the necessity." (Italics ours.)

This instruction is erroneous in two particulars. First, it required that the accused show (prove) that his action in self-defense reasonably appeared to him to be necessary. It imposed upon him the burden, in the final analysis and weighing of the evidence, to establish that defense. To the lay mind, "must show to the jury", is of the same meaning and import as the phrases, "must prove to the satisfaction of the jury", or, "had the burden of proving * * * by preponderance of the evidence", condemned respectively in *Covington* v. *Commonwealth*, 136 Va. 665, 116 S. E. 462, and *Hale* v. *Commonwealth*, 165 Va. 808, 183 S. E. 180.

There is nothing in the instruction which qualifies or limits it to the burden of going forward with the evidence. It requires the accused to carry the burden of proof on his claim of self-defense in the ultimate and final determination of the weight of all the evidence. By imposing such a

burden, it took from the accused his right to acquittal if the jury, after considering all the evidence, entertained a reasonable doubt whether he acted in self-defense or not. Rendering it more objectionable was the language of the last two lines, "that the accused must not have wrongfully occasioned the necessity." That is a suggestion without supporting evidence, that the necessity of self-defense did not exist. It emphasized the erroneously heavy burden thereinbefore imposed upon accused by the phrase, "must show to the jury."

The instruction is erroneous—it is not cured by the other instructions, and constitutes reversible error.

The refusal of the trial court to give Instruction B was also error. The instruction is as follows:

"The Court instructs the jury that if you believe from the evidence the deceased, Eddie Grimes, without cause, attacked and knocked the defendant down and beat him until bystanders restrained him and that immediately upon being compelled to desist from beating the defendant the deceased stated in the hearing of the defendant that he would kill the defendant that day, or used words which conveyed a similar meaning to defendant, and which defendant believed, and that deceased went towards his home, down Crumpler's Alley, and the defendant had reasonable cause to believe, and did believe, that he had gone for a weapon with which to do serious bodily harm to, or kill, the defendant, then the defendant had the right to arm himself for the purpose of his defense, and if you further believe the defendant did so arm himself and was standing on the back steps of his home and that the deceased immediately came back from his home to the back yard of defendant and *started therein* with his hand thrust in his pocket with motion as if to withdraw therefrom a pistol, or other dangerous weapon, and the *deceased* had reasonable cause to believe, and did believe, that deceased had a deadly weapon and such weapon was to be used upon him, or that he was in danger of great bodily harm or death, and that to defend himself defendant shot his

pistol towards and hit the deceased, of which he died, then you will find the defendant not guilty." (Italics ours.)

The italicized word "deceased" near the end of the instruction is obviously a mistake and the word "accused" was intended. The words "started therein" are not supported by the evidence and should have been omitted. The words "stopped and turned toward him" are in accord with the evidence in this particular. However, it does not appear and is not believed that the instruction was refused by the court for those obvious and trivial errors.

In our opinion there was sufficient evidence on behalf of the accused to justify submission to the jury of the question whether or not he acted in self-defense. By appropriate recitals, Instruction B presented to the jury the theory relied on by the accused. No other instruction undertook to do this. All of the factual recitals therein are supported by some testimony except in the one minor particular noted above. If the jury believed the theory so presented, the accused was entitled to acquittal. It was of vital importance to him that such a finding instruction reciting the evidential matter relied on be given. To refuse the same was prejudicial error. *Hale* v. *Commonwealth*, 165 Va. 808, 183 S. E. 180; *Harris* v. *Commonwealth*, 134 Va. 688, 114 S. E. 597.

The conclusion reached in *Hale* v. *Commonwealth, supra,* at page 813, upon a similar situation is thus expressed:

"Whether the homicide occurred under the circumstances related by the witnesses for the accused, or under those related by the witnesses for the Commonwealth, was a question which the accused had the right to have submitted to the jury under the instruction requested. The refusal of the trial court to do so was reversible error. *Tucker* v. *Commonwealth*, 159 Va. 1038, 1048, 167 S. E. 253."

We also find in *Campbell* v. *Commonwealth*, 162 Va. 818, at page 827, 174 S. E. 856, the following:

"It is elementary that both the Commonwealth and the defendant are entitled to appropriate instructions giving

to the jury the law applicable to each version of the case, predicated, of course, upon the evidence."

For the reasons herein stated, the judgment of the trial court is reversed and the case remanded for a new trial.

*Reversed and remanded.*