# Richmond

GLADYS BLANKENSHIP v. COMMONWEALTH OF VIRGINIA.

April 21, 1952.

Record No. 3951.

Present, All the Justices.

The opinion states the case.

*J. Livingstone Dillow,* for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General* and *Frederick T. Gray, Assistant Attorney General,* for the Commonwealth.

Spratley, J., delivered the opinion of the court.

Gladys Blankenship was indicted for the murder of her husband, Drewey Blankenship, tried by a jury, and convicted of involuntary manslaughter. Her punishment was fixed at one year in the penitentiary.

These are the pertinent facts and circumstances attendant upon the homicide.

Mrs. Blankenship, 38 years of age, was married to the deceased about 16 years before his death. They had lived together since their marriage and seven children, ranging in age to 15 years, had been born to them. In the month following his death, she gave birth to an eighth child.

In response to calls from the children of the couple, Doctor E. S. Carr and a police sergeant went to the Blankenship home early in the morning of the day the deceased was shot. They found the defendant lying across a bed with her arms around her wounded husband. She was rather hysterical and crying. She told Dr. Carr and the police officer that she had gotten up from her bed that morning, had gone to a toilet near the rear of the house, and, upon her return, had seen a strange man running off the back porch and found her husband shot.

Drewey Blankenship had received a bullet wound in the back of his head, had bled profusely, and was unconscious. He was removed to a hospital, where he died several hours later. The police sergeant, assisted by other officers, said he searched the home from top to bottom in an effort to find the lethal weapon; but found none and gave up the search. Later the same day, after the death of Blankenship, the defendant was arrested and lodged in the county jail on a charge of murder. On the next day the sergeant of police received word from the defendant that she wanted to talk with him. She requested that he bring with him the pastor of her church.

The police sergeant and her pastor went to the jail. They found defendant somewhat hysterical. She told them she

wanted to tell the truth; that what she had said previously about seeing a strange man running from her home was not true; that she had seen no such person; and that if they would return to her home and look in a garbage can in the rear hall near the kitchen they would find the pistol beneath some potato peelings, where she had placed it. According to her statement, she and her husband had gone to bed about ten o'clock the night before, she suddenly awoke at an early hour the next morning, found her husband's pistol lying across or near her hand, and saw that her husband had been shot. Frightened she placed the pistol in the garbage can.

In explanation of her reason for telling a different story the day before, she said she was so scared that she did not know what to do, and did not want her young children to think that she had shot their father. After she had hidden the pistol, she awakened her children, told them that their father had been shot and asked them to call the neighbors for help. She told the children that she was asleep, and had no recollection of anything that may have happened, and that if she shot the deceased, she shot him in her sleep.

Upon her trial, Mrs. Blankenship testified that she and her husband were a loving and devoted couple, and that there had never been any kind of trouble between them; that her husband owned a pistol which he usually kept hanging on a nail on the wall in the bedroom; and that sometimes he put the pistol in a locker and at other times slept with it under his pillow. She repeated the same account of the shooting made by her to the sergeant of police and her pastor on the day after her arrest, saying that she had no reason to shoot or kill her husband. She added that he was good to her always and provided for her well. She said she did not know whether or not he carried any life insurance.

A number of witnesses, relatives of the deceased and neighbors of the couple, testified to the effect that the couple had been living happily for many years in complete harmony, and that the defendant bore a good reputation for truth and veracity.

Dr. G. B. Arnold, a practitioner of medicine, who specialized in psychiatry, testified that, based on the facts related to him, he was of opinion that it was not only possible but probable that the defendant was asleep and unconscious when the gun was fired against the head of the deceased. He thought that the

false story first told by the defendant was brought on by a fear psychosis, and was natural under the circumstances.

There was some evidence that two days before the homicide, the deceased had made a statement in the presence of his wife that "Well, if anything happens to me there is sufficient insurance to take care of Gladys and the kids." But the witnesses who heard that statement were unable to say that it was heard by the defendant. It was shown that deceased carried insurance policies with benefits amounting to $6,328, and that action had been brought by the defendant and her children to recover thereon.

The Commonwealth asked for a conviction of murder in the first degree. The defendant contended that the evidence was wholly insufficient to show that she was guilty of any offense whatever.

The trial court, over the objection of the defendant, gave the jury an instruction which defined murder in the first degree, murder in the second degree, voluntary manslaughter, involuntary manslaughter, and assault and battery, and told them that the defendant could be convicted of any one of said offenses, if they believed from the evidence, beyond all reasonable doubt, that she was guilty of such offense.

Defendant's objections were based upon the grounds that there was no evidence tending to prove voluntary manslaughter, involuntary manslaughter, or assault and battery, and that the instruction was confusing and misleading in that it invited the jury to return a compromise verdict.

The guilt or innocence of the defendant as to any grade of the offense charged was dependent upon the inferences which the jury was entitled to draw reasonably from the established facts and circumstances. The record shows no outward evidence of motive, malice, or ill will, actual or implied, on the part of the defendant. While she undertook to prove that the killing was done accidentally in her sleep, she neither denied nor admitted that she fired the fatal shot. She did not say whether she heard the sound of the pistol shot fired by her own hand. Notwithstanding friendly relations with her husband, she concocted a story of the shooting contrary to the truth. She cunningly undertook to hide the pistol with which the fatal shot was fired. She gave fear as the reason for her false statement and the concealment of the deadly weapon.

In appraising defendant's testimony and the circumstances shown, the jury had the right to give due effect to the manner and bearing of the defendant on the stand. They obviously thought that her story was not in harmony with the circumstances. It was difficult to believe that she could have slept without hearing the shot of the pistol fired by her own hand. If her final story of the shooting was true, it was not entirely easy to understand why she did not promptly assert her innocence.

The facts were sufficient to establish the killing of the deceased by the defendant. In Virginia, every homicide is *prima facie* murder in the second degree. To elevate the grade of the offense to murder in the first degree, the burden was on the Commonwealth to show that the killing was "wilful, deliberate and premeditated." Code of Virginia, 1950, § 18-30, and, on the other hand, to reduce the grade, the burden was on the accused to produce evidence showing justification or excuse for the homicide. *Bryan* v. *Commonwealth,* 131 Va. 709, 714, 109 S. E. 477; *Sims* v. *Commonwealth,* 134 Va. 736, 752, 115 S. E. 382; *Bradshaw* v. *Commonwealth,* 174 Va. 391, 398, 4 S. E. (2d) 752.

The jury, by their verdict, said that the defendant was guilty of involuntary manslaughter, an unlawful and felonious homicide. To reach this conclusion they must have believed that defendant fired the fatal shot; but disbelieved her explanation that it was fired while she was asleep or unconscious. Thus, the verdict means that she failed to show that her act was excusable, the defense relied on.

Section 19-224 of the Code of Virginia, 1950, (formerly § 4920 of the Code of 1942, (Michie), § 4042 of the Code of 1887, provides that a jury in this State "may" on an indictment for murder in the first degree return a verdict of involuntary manslaughter, although the evidence be sufficient to justify conviction of a higher grade of homicide. The material portion of that section reads as follows:

"On an indictment for felonious homicide the jury may find the accused not guilty of the felony but guilty of involuntary manslaughter."

The contention of defendant that the court erred in instructing the jury as to voluntary manslaughter, involuntary manslaughter, or assault and battery, because there was no evidence which tended to prove the commission of any of those of-

fenses, is refuted by the rule adhered to by this court in a long line of cases, among which are the following: *Burton & Conquest* v. *Commonwealth,* 108 Va. 892, 900, 62 S. E. 376; *Connell* v. *Commonwealth,* 144 Va. 553, 131 S. E. 196; *Tucker* v. *Commonwealth,* 159 Va. 1038, 167 S. E. 253; *Maxwell* v. *Commonwealth,* 165 Va. 860, 183 S. E. 452; *Fleming* v. *Commonwealth,* 170 Va. 636, 196 S. E. 696; *Puckett* v. *Commonwealth,* 182 Va. 237, 28 S. E. (2d) 619; *LaMarr* v. *Commonwealth,* 183 Va. 859, 33 S. E. (2d) 641; *Taylor* v. *Commonwealth,* 186 Va. 587, 590, 591, 43 S. E. (2d) 906.

In *Burton & Conquest* v. *Commonwealth, supra,* we declared that the verdict of a jury finding an accused guilty of a lesser degree of homicide would not be disturbed, even though the evidence adduced tended to prove murder in the first degree and none other. Judge Keith there said that, unless this practical application of the principles of law was upheld, "owing to the tenderness of juries and their reluctance to impose the highest penalty, many crimes would go wholly unpunished, and thus the rigor of the law would tend rather to the promotion than to the prevention of crime." (108 Va. at page 900).

In *Taylor* v. *Commonwealth, supra,* where the evidence for the Commonwealth tended to prove murder in the first degree, with no ameliorating circumstances, and the evidence for the defendant tended to show a justifiable homicide, the trial court, nevertheless, instructed the jury as to what constituted involuntary manslaughter. The jury returned a verdict of involuntary manslaughter which we refused to disturb. There, after reviewing the authorities, Mr. Justice Hudgins, now Chief Justice Hudgins, said in summary: (1) "It is reversible error for the trial court to refuse to instruct the jury on the lesser offenses charged in the indictment if there is any evidence in the record tending to prove such lesser offenses." (Citing cases). (2) "It is not reversible error for the trial court to refuse to instruct the jury on the lesser offenses charged in the indictment if the record contains no evidence tending to prove them." (Citing cases). (3) "Notwithstanding the *obiter dicta* in several Virginia opinions, we have found no case in which this court has reversed the trial court solely on the ground that the jury were instructed on the lesser grade of offense included in the indictment where the only evidence in the record tended to prove a higher grade of crime charged."

In 26 Am. Jur., Homicide, section 563, page 550, it is said:

"While there is some conflict on the question, the rule supported by the weight of authority seems to be that if the evidence demands or warrants a conviction of a higher degree of homicide than that found by the verdict, and there is either no evidence in support of acquittal or, if there is, it is not sufficient to warrant or require acquittal, or is disbelieved by the jury, the defendant is not entitled to a reversal or a new trial on the ground that the court instructed on the lower degree of homicide, as to which there was no evidence, the theory being that he is not prejudiced thereby and cannot complain."

Although there is authority from other jurisdictions which is not in accord with the rule adopted in Virginia, the modern tendency is towards its general acceptance. Later cases from a number of the States, cited by the defendant in support of the contrary rule, have now adopted the rule approved in Virginia.

For further discussion of the subject, see 21 A. L. R., 624; 27 A. L. R., 1100; 102 A. L. R., 1029; *Sparf & Hansen* v. *United States,* 156 U. S. 51, 15 S. Ct. 273, 39 L. ed. 343; and 41 C. J. S., Homicide, section 409.

The jury did not have to believe either the theory of the Commonwealth or that of the defendant, entirely. They had the right to accept such parts of the evidence as they believed to be true. Under our statutes, they have a rather wide latitude in applying the law to the facts and in fixing the degree of guilt of one convicted of crime. If, for some reason satisfactory to them, they mistakenly believe that an accused is not guilty of the higher grade of offense charged, and find him guilty of a lesser grade, it is difficult to see how the mitigation is harmful to the accused. Furthermore, as the Commonwealth suggests, it would be an anomaly in the law to uphold a verdict returned by an uninstructed jury for a lesser grade of an offense than that shown by the evidence, as allowed under Code, § 19-224, and reverse it when returned by an instructed jury.

We find no error in the record. For the reasons stated, the judgment of the trial court is affirmed.

*Affirmed.*