STATE of Maine

v.

Augustus F. HEALD.

Supreme Judicial Court of Maine.

July 6, 1972.

Chadbourn H. Smith, John R. Atwood, Asst. Attys. Gen., Augusta, for plaintiff.

Eaton, Glass, Marsano & Hammond by Francis C. Marsano, Belfast, for defendant.

Before DUFRESNE, C. J., and WEBBER, WEATHERBEE, POMEROY, WERNICK, and ARCHIBALD, JJ.

WEBBER, Justice.

The defendant Heald, tried for murder, was convicted by a jury of manslaughter. His appeal has been ably presented by counsel appointed by the Court for that purpose but who was not defendant's counsel at the time of trial.

The jury could have found beyond a reasonable doubt that at about 4:00 P.M. on January 16, 1965 one Ethlyn Hamilton and her son Wayne came to Belfast by automobile; that by prior arrangement they met Edna Hamilton, victim of this homicide, at the "frozen food locker;" that they were related to Mrs. Hamilton by marriage; that they drove Mrs. Hamilton to the apartment occupied by Mariba Beard, Mrs. Hamilton's sister; that they waited in the parked automobile while Mrs. Hamilton entered the apartment situated on the second floor; that within approximately three minutes they heard a "bang" from within the building; that Mrs. Hamilton then ran from the door, leaped from the porch, ran about 20 feet to the side and fell or threw herself face down on the snow covered ground with her arms over her head; that the door to the Beard apartment then opened part way and a hand holding a revolver emerged; that the revolver was aimed and fired at Mrs. Hamilton; that the person holding the revolver closed the door; that Mrs. Hamilton bled profusely as she lay on the snow; that as the door closed she rose to her feet, ran and entered the car exclaiming, "My God, he shot me!"; that Mrs. Hamilton died at the hospital at about 5:00 P.M. as the result of multiple gunshot wounds; that persons who lived in other apartments in the same building and

who knew the defendant had seen him on prior occasions entering, leaving and sitting near the window of the Beard apartment; that he had been seen picking up articles of the type often found in a woman's handbag which articles had been lying on the porch in front of the Beard apartment door throughout part of the day on January 16, 1965; that these articles were found after the shooting in the Beard apartment; that the homicide was observed by four eye witnesses, two of whom had an opportunity to observe the face of the killer and recognized it as that of the defendant whom they knew; and that very shortly after the shooting the defendant was observed by three witnesses emerging from the back door of the Beard apartment at the rear of the building and leaving the area. This evidence, standing undisputed and uncontradicted by evidence from any source, constitutes overwhelming proof of an unlawful homicide and would have fully supported a verdict of guilty of the crime of murder. For reasons which will appear it likewise supports a verdict of guilty of the crime of manslaughter.

The defendant vigorously contends that since there was no evidence from any source either of heat of passion induced by sudden provocation or of any other circumstances tending to reduce the degree of the homicide to voluntary or involuntary manslaughter, the jury was obliged to find the defendant either guilty of murder or not guilty. He asserts that a manslaughter verdict was "preposterous" and must be set aside. This argument has been frequently made and in the great majority of cases summarily rejected. The rationale for the majority rule is that a defendant cannot be heard to complain of an error which works to his advantage. He is not thereby prejudiced. Smith v. State (1953) 222 Ark. 650, 262 S.W.2d 272; Blankenship v. Commonwealth (1952) 193 Va. 587, 70 S.E.2d 335, 338; Calicoat v. State (1923) 131 Miss. 169, 95 So. 318 (overruling Rester v. State [1916] 110

Miss. 689, 70 So. 881. In *Blankenship* the Court said:

"If, for some reason satisfactory to them (the jury), they mistakenly believe that an accused is not guilty of the higher grade of offense charged, and find him guilty of a lesser grade, it is difficult to see how the mitigation is harmful to the accused."

A fortiori, when the defendant requests that the lesser degree of the offense be submitted to the jury as a possible verdict or fails seasonably to object when that occurs, there is an additional reason for declining to disturb a verdict based on that alternative. In State v. Gottstein (1920) 111 Wash. 600, 191 P. 766, 767 the Court said:

"While the trial court, as we view the evidence, would have been justified in submitting to the jury first degree murder only, yet the defendant, having requested instructions on murder in the second degree and manslaughter, cannot now complain because his request was * * * granted. If, under the evidence, it was error to submit the question of murder in the second degree, the defendant by his request invited such error."

In a strongly worded dictum in Lasecki v. State (1926) 190 Wis. 274, 208 N.W. 868, the Court repudiated the identical argument advanced by the defendant in the instant case. Characterizing the defendant's position as playing his game with loaded dice, the Court recognized his purpose as being to obtain a reversal while at the same time saving by a claim of double jeopardy the benefit of the acquittal of murder in the first degree. The Court indicated that it would decline to administer the rules of law so as to work such an injustice in the name of justice.

With the policy considerations and rationale which underlie the majority view we are in full accord. The supporting authorities are assembled in three Annota-tions found in 21 A.L.R. 622, 27 A.L.R. 1100, and 102 A.L.R. 1026 and in 40 Am. Jur.2d 788, Sec. 533.

In the instant case the presiding Justice saw fit to define for the jury the requisite elements of voluntary manslaughter and afford the jury an opportunity to render a verdict finding defendant in one alternative guilty of manslaughter. No objection was taken to the charge in this respect. On the contrary, at the close of the instructions counsel for the defendant addressed the Court's attention to the fact that he had "repeatedly, at least four times, * * * expressed the elements of murder and only expressed the law of manslaughter once." The presiding Justice thereafter and in obvious response to this objection gave further instructions with respect to manslaughter as a possible alternative verdict. The Court then inquired if these instructions were satisfactory to which counsel for defendant responded affirmatively. We conclude that the defendant is precluded from claiming aggrievement either with respect to the giving of the manslaughter charge or the verdict which resulted therefrom.

■ The State produced and caused to be marked as an exhibit a revolver which had been found by a police officer in the rain gutter of a building toward which the defendant was seen to be proceeding when he left the Beard apartment after the shooting. This weapon closely resembled the handgun which witnesses saw in the hand of the defendant when he shot Mrs. Hamilton. All testimony with respect to this exhibit and the continuity of possession of it by the police was met by a barrage of objections from defense counsel. For reasons which do not appear of record the State abandoned its efforts to get the exhibit admitted into evidence. At the close of the State's case, the defendant moved for a mistrial on the ground that the jury had seen the exhibit and their view of it was prejudicial. This motion was denied and that denial is now claimed to be prejudicial reversible error. At the

close of his main charge, the presiding Justice was reminded by counsel for defendant that he had made no reference to the exhibit and given no cautionary instruction with respect to it. Additional instructions were then given which in our view adequately informed the jury that the exhibit had never been "connected with the respondent" and was not in evidence or properly for their consideration in reaching a verdict. These instructions were declared to be "satisfactory" by defendant's counsel. The defendant has brought to our attention several cases in which evidence was admitted but subsequently ordered stricken and the customary instruction to disregard the evidence was given. On the particular facts of these cases it was held that the stricken evidence was so inherently prejudicial that the curative instruction would not suffice and a new trial was required. Burgett v. State of Texas (1967) 389 U.S. 109, 88 S.Ct. 258, 19 L.Ed.2d 319; State v. Suleski (1965), 67 Wash.2d 45, 406 P.2d 613; People v. Matteson (1964) 61 Cal.2d 466, 39 Cal.Rptr. 1, 393 P.2d 161. In our view all such cases are readily distinguishable upon their facts. At the outset the defendant cites no case and none has been discovered by our own research where an exhibit *never admitted* into evidence has been deemed the basis of such incurable error. Moreover, in the words of Mr. Justice Harlan, dissenting in *Burgett,* "the record in this case shows no prosecutorial bad faith or intentional misconduct." We think the applicable rules were well stated in Dolan v. United States (1955) 8 Cir., 218 F.2d 454, 460 wherein the Court said:

"The general rule is that where evidence is erroneously admitted the subsequent striking of it from the case, accompanied by a clear and positive instruction to the jury to disregard the evidence, cures the error. But if the evidence is of such an exceptionally prejudicial character that its withdrawal from the consideration of the jury cannot remove the harmful effect caused by its admission, a new trial will be granted. * * *

"A rule which would require a trial court to declare a mistrial and to discharge a jury whenever the court discovered that evidence had been improperly and mistakenly admitted would be absurd. What the applicable rule means, as every experienced trial judge understands, is that errors in admitting evidence ordinarily can and should be cured by striking the evidence and instructing the jury to disregard it, but that there can be exceptional situations in which such errors are incurable.

"The question whether the admission of evidence which turns out to be inadmissible requires such a drastic remedy as the granting of a mistrial is addressed to the sound discretion of the trial court, which has the feel of the case and is in a far better position than an appellate court to appraise the effect upon the minds of the jurors of the evidence improperly admitted and to determine whether the jury is capable of following the court's instructions to disregard such evidence. * * * As was said by Mr. Justice Brandeis in *Fairmount Glass Works v. Cub Fork Coal Co.,* 287 U.S. 474, 485, 53 S.Ct. 252, 255, 77 L.Ed. 439, 'Appellate courts should be slow to impute to juries a disregard of their duties, and to trial courts a want of diligence or perspicacity in appraising the jury's conduct.' "

On the facts of the instant case we see no "exceptional circumstances" such as might put this case outside the rules which ordinarily obtain when exhibits are marked but are neither offered nor admitted into evidence. The matter clearly lay within the sound discretion of the presiding Justice and no circumstances requiring the granting of a mistrial are shown. Whether or not the exhibit was or was not the murder

**204**

weapon loses much of its significance in view of the fact that the *actual* weapon used by the defendant to kill Mrs. Hamilton was observed by the eye witnesses at the time the shooting was actually occurring. The exhibit, even if offered and admitted, would at most have constituted merely cumulative circumstantial evidence in support of overwhelming and undisputed *direct* evidence that defendant used a handgun to kill his victim. Defendant takes nothing by this assignment of error.

■ The jury retired to consider its verdict at 3:20 P.M. At about 6:40 P.M. they suspended their deliberations long enough to partake of an evening meal. At 10:05 P.M. they were recalled by the presiding Justice and given the instructions which for many years have been referred to as the "8th Cushing." No objections were offered to the giving of these instructions. At 10:35 P.M. the jury reported its verdict. The defendant makes the usual assertion that the giving of this charge was coercive. It must be noted that this trial occurred in 1965 when the so-called Tuey-Allen charge[1] had many times been approved by this Court and many years before we first criticized it in State v. White (1972-Me.) 285 A.2d 832. We held in *White* and repeat here that the Tuey charge is not "coercive *per se*." Although we reaffirm here our recommendations set forth in *White,* we decline to disturb a conviction under the circumstances of this case merely because the Tuey charge was given, without objection, after a period of 6½ hours had elapsed from the time the jury began its deliberations.

We conclude that the defendant received a trial which was eminently fair to him and that he shows no prejudicial error.

Appeal denied.

All Justices concurring.

1. Commonwealth v. Tuey, 8 Cush. (Mass.) 1; Allen v. United States (1896) 164 U.S. 492, 41 L.Ed. 528, 17 S.Ct. 154 (approving the Tuey charge).